WEIMER, Justice.
1,Defendant James C. Magee was indicted by a grand jury for the first degree murder of Adrienne Magee, the first degree murder of Ashton Zachary Magee (“Zack”), the attempted first degree murder of S.M., and the attempted first degree murder of L.M.[1] The defendant was tried before a St. Tammany Parish jury. Following the close of evidence, the jury found the defendant guilty as charged on all counts and, at the conclusion of the penalty phase of the trial, recommended two sentences of death. In accordance with that recommendation, the district court sentenced the defendant to death by lethal injection for the murders of Adrienne and Zack Magee and to two consecutive terms of 50 years of imprisonment at hard labor without benefit of parole, probation or suspension of sentence for the attempted first degree murders of S.M. and L.M.
| ¿This is a direct appeal under La. Const, art. V, § 5(D) by James C. Magee, who appeals his convictions and sentences, raising 17 assignments of error.[2] After a thorough review of the law and the evidence, no merit is found in any of the assignments of error urged by the defendant. Therefore, the defendant’s convictions and sentences are affirmed.
FACTS AND PROCEDURAL HISTORY
On April 18, 2007, James C. Magee shot and killed his wife Adrienne and their five-year-old son, Zack. He also injured his two daughters, nine-year-old S.M. and eight-year-old L.M.
At the time of the shootings, James and Adrienne, who wed in 1998, had been married for approximately eight years. James was employed as a welder and Adrienne worked at a daycare center owned by her cousin, Tracy Delatte. The couple had three children: S.M., L.M., and Zack.
While the Magees’ relationship had been a troubled one, in the fall of 2006, James began experiencing pain in his feet, for which he was prescribed painkillers. The painkillers, coupled with excessive alcohol use, tested the limits of Adrienne’s forbearance. In late 2006, the couple separated and Adrienne and the children moved in with Tracy, who lived in the Tall Timbers subdivision in Mandeville, Louisiana, located near the daycare center where both women worked. Afterwards, the children saw their father regularly, primarily on the weekends.
*294 Consistent with this visitation plan, on Sunday, April 15, 2007, James took the children to the Ponchatoula Strawberry Festival. That evening, as prearranged, Adrienne went to the Abita Springs ballpark to pick up the children. When Adrienne |.^returned to Tracy’s home from her rendezvous with James, she was visibly upset. The children were likewise behaving strangely. That evening, James began telephoning Adrienne continuously, leaving a stream of threatening and otherwise “unpleasant” messages in her voice mailbox. Because James kept filling her mailbox with these at-times-angry, at-times-pleading messages, Adrienne purchased a small tape recorder. She recorded the messages each time she emptied her voice mailbox, only to have it fill up again. Fearing for her safety, Adrienne and Tracy moved Adrienne’s vehicle to the parking lot of a nearby hospital. The calls from James persisted. At one point during the evening, James telephoned a co-worker, Murray Latapie, from a bar, informing him that he wanted to “kill them all.”[3]
The next morning, when the calls from James resumed, Adrienne and Tracy drove to the police station in Covington, Louisiana, where Adrienne filled out a police report. At the suggestion of a deputy, the women proceeded to the courthouse to apply for a restraining order against James. After completing the necessary paperwork, they were informed the order would not be signed until the next day. Having observed James drive by the daycare center several times that day, the women arranged for a police detail at the daycare center.
The following morning, Tuesday, April 17, 2007, the calls from James continued. Tracy and Adrienne went to work at the daycare center, where they received a call informing them the restraining order had been signed. They traveled to the courthouse to pick up a copy of the order and, in an effort to facilitate the process, delivered a copy to an officer for service on James. They also delivered a copy of the order to the children’s school before returning to the daycare center where |4the police detail had commenced. From a deployed officer, Tracy and Adrienne learned that the restraining order had been served on James. The calls from James ceased.
Meanwhile, James went to the home of a neighbor, Henry Poirier, Jr., and asked for permission to use his computer so that he might try to locate the physical address for a phone number he had obtained. Poirier warned James “not to do anything stupid,” but James giggled, telling Poirier not to worry, he “would read about it in the paper.”
Despite concerns voiced by Tracy, Adrienne retrieved her car from the hospital parking lot Tuesday evening. On Wednesday morning, April 18, 2007, Adrienne resumed her normal routine. Because no further telephone calls had been received from James, the police detail was discontinued. The situation remained quiet until approximately 3:30 p.m., when Tracy received a telephone call from James. Although Tracy did not answer the call, she immediately reported it to Adrienne. Shortly thereafter, Tracy overheard Adrienne speaking on the telephone with James, informing him he would not be able to see the children that weekend due to the restraining order, but assuring him that after the court hearing scheduled for the following Wednesday, visitation would resume, only this time according to a written schedule. After speaking with James, Adrienne reported to Tracy that James *295 was “in sorry mode.” Unbeknownst to Adrienne, however, at approximately 2:00 p.m. that day, James had purchased one hundred rounds of 12-gauge shotgun shells from a local store.
S.M., L.M., and Zack arrived at the daycare center by school bus at their regular time that afternoon. Zack had baseball practice that evening, so at approximately 4:40 p.m., Adrienne loaded the children into her car and left for | ^Tracy’s house so Zack could change clothes for practice. At approximately the same time, Tyler Mendoza, who lived in Tracy’s subdivision, was riding his bicycle to a friend’s house when he suddenly heard the sound of screeching tires and a revving engine behind him. Turning, he observed a white truck ram into the rear of a small car, sending the car into a nearby ditch. The car struck a fence, crossed over a driveway, and hit a tree. Amid the sounds of a woman’s screams, Tyler observed the white truck come to a stop and a man, who he later identified as defendant, exit the truck with a shotgun in his hand. When he observed the man pump the shotgun, Tyler fled the scene in fear, hearing three or four gunshots as he pedaled away.
Delbert Bryars, who lived in the neighborhood, also heard the screeching of tires and the clashing of metal. Exiting his kitchen to his driveway, he discovered a car lodged against a tree. Like Tyler, Bryars observed a man exit a white truck and head toward the car. He heal’d a woman scream, “No, no, no,” and saw the butt of a gun. A shot was fired and the screaming stopped. Bryars shouted to his wife to call the police. Another shot was fired. Bryars headed toward the truck, but stopped short at the sound of two additional shots being fired. The man then returned to his truck and drove away.
As Bryars made his way toward the car, he observed Zack lying in the street and his mother lying face-up in the ditch. He noticed movement in the car and realized there were two young girls climbing over the seats. He reached S.M., who was holding a bleeding shoulder, first and instructed a neighbor, Donna Sisung, who had arrived on the scene after hearing the gunshots, to take her to his house. L.M. assured Bryars she was not hurt and followed her sister. As Bryars walked with L.M. to his house, they passed Adrienne and Zack. L.M. identified the individuals as her mother and brother and told Bryars that her father “did this. He hates us.”
| fiKathy Teegarden, a co-worker of Adrienne’s, was leaving work shortly before 5:00 p.m. when she witnessed James’ truck pull into the daycare center parking lot. She was forced to slam on her brakes to avoid colliding with the speeding truck. Recognizing the truck and aware of the problems that Adrienne was having with James, she attempted to alert another coworker who might warn Adrienne of his presence. Unfortunately, she was too late.
The first officer to arrive at the scene was Devin Palys. Officer Palys responded to the “hot call” of a crime in progress and arrived at the scene within minutes. He observed the crashed car and the bodies near it. He discovered that the female victim was deceased, but the child was still breathing. Officer Palys called for multiple emergency medical units and allowed a nurse, Michelle Talazac, who lived in the neighborhood and came to the scene, to assist Zack while awaiting the arrival of additional responders. Zack died during the resuscitation efforts. Officer Palys then proceeded to the Bryars residence where he spoke with both girls. L.M. identified the defendant as the perpetrator and provided his address.
Police officers at the scene were able to reach the defendant on his cell phone. In an extended conversation the officers re *296 corded, James indicated that he had changed vehicles (an assertion which later proved to be false) and that he was on his way home. However, as James continued to talk, the. police officers were able to “ping” the location of his cell phone. They discovered that he was actually driving on 1-10 in Mississippi. Eventually, authorities succeeded in locating and apprehending James near Mobile, Alabama.
Officer Joseph Picone traveled to Alabama to meet with the defendant. Although the police retrieved (among other items) an assortment of pills and some empty Smirnoff Ice bottles from his truck, when Officer Picone approached James the livening of the shooting, he did not smell alcohol, note any injuries to the defendant’s person, or observe any other sign of impairment. The defendant waived his rights and provided a recorded statement in which he admitted shooting his wife and children. He did not contest his extradition to Louisiana.
On May 24, 2007, a St. Tammany Parish grand jury returned an indictment charging the defendant with two counts of first degree murder, in violation of La. R.S. 14:30, and two counts of attempted first degree murder, in violation of La. R.S. 14:27 and 14:80. He pleaded not guilty to the charges on June 11, 2007. On the same date, the district court, citing Professional Rule of Conduct 3.6, admonished all participants to refrain from making public statements about the case.
On January 15, 2009, the defendant filed a motion for change of venue, alleging that extensive media coverage and pretrial publicity precluded the seating of a fair and impartial jury in St. Tammany Parish. The district court deferred ruling on the motion until the conclusion of voir dire.
Ten days prior to the commencement of trial, on October 2, 2009, the state filed a motion for closed circuit testimony seeking a ruling that any testimony given by S.M. and/or L.M. would be delivered via closed circuit television, outside of the defendant’s presence. Following a hearing, the district court granted the motion, finding the state presented proof sufficient to satisfy the requirements of La. R.S. 15:283. The district court, on October 13, 2009, also granted a motion in limine filed by the state seeking to preclude the questioning of witnesses as to their preferences regarding punishment. The court ruled that it would not allow the parties to ask any witness his or her preference regarding the appropriate penalty to be imposed, reasoning that such a question would invade the province of the jury.
LJury selection in the defendant’s case began on October 12, 2009, and concluded on October 15, 2009. After seating a jury, the district court denied the defendant’s previously deferred motion for change of venue. The state commenced the presentation of its case on October 16, 2009. In addition to the testimony of Tracy Delatte, who outlined the events preceding the fatal confrontation on Wednesday, April 18, 2007,[4] and the testimony of those neighbors and individuals who either witnessed the ramming of Adrienne’s car or came upon the scene shortly thereafter — Delbert Bryars, Donna Sisung, Tyler Mendoza, Donna Wallace, and Kim Bourgeois— the state introduced physical and scientific evidence. Firearms expert Meredyth Acosta matched spent shotgun shells recovered from the scene to the gun found in the defendant’s truck. Tommy Morse, an expert in fingerprint identification, *297 matched prints taken from a shotgun shell and the barrel of the shotgun to the defendant. Dr. Michael Defatta, an expert in forensic pathology who conducted the autopsies of Adrienne and Zack, testified about the gunshot wounds to the victims. Dr. Defatta surmised that Adrienne was shot in the left side of her face from a distance of no more than one to two feet and that her injury was instantly fatal. According to Dr. Defatta, Zack suffered two gunshot wounds, one to his left shoulder and the other to the left side of his head. The doctor estimated the shot to Zack’s shoulder came from a distance of one to two feet, while the shot to his head came from a distance of three to four feet. Dr. Defatta opined that Zack’s head wound was fatal.
lflThe state concluded the presentation of its case on October 17, 2009. The defense rested its case without presenting any evidence. Following deliberations, the jury found the defendant guilty as charged on all counts.
The penalty phase of the trial commenced on October 19, 2009. The state called a responding officer, a responding nurse, and two of Adrienne’s co-workers to present victim impact testimony. In addition, the testimony of a neighbor of the Magees and a co-worker of the defendant was offered to flesh out the events surrounding the crimes. The defendant called his father, his stepfather, and his mother who all testified about the hardships the defendant suffered as a child and his struggles with prescription medications and emotional distress in the months leading up to the crimes.
At the conclusion of the penalty phase of the trial, the jury unanimously found, as to Adrienne, that the defendant knowingly created a risk of death or great bodily harm to more than one person and, as to Zack, that the defendant knowingly created a risk of death or great bodily harm to more than one person and that the victim was under the age of 12 years. Two sentences of death were returned.
The district court denied the defendant’s motion for new trial and, on January 4, 2010, formally sentenced him to death for the first degree murders of Adrienne and Zack. The defendant was additionally sentenced to two consecutive terms of 50 years of imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence, for the attempted first degree murders of S.M. and L.M. A defense motion to reconsider sentence and quash improperly joined offenses was denied on |10March 15, 2010. This direct appeal, in which the defendant asserts a total of 19 assignments of error, ensued.[5]
LAW AND ANALYSIS
A. Change of Venue
In assignments of error numbers 5 and 6, the defendant asserts the district court erroneously denied his motion for change of venue and, in doing so, improperly restricted the scope of voir dire with respect to the extent and effect of pretrial publicity on prospective jurors.
The defendant filed a motion for change of venue several months prior to trial. However, the district court postponed ruling on the motion until the conclusion of voir dire. Following jury selection, the district court denied the defendant’s motion, primarily because a jury had been successfully seated. The defendant pro *298 tests this ruling, arguing that extensive pretrial publicity, community impact evidence, and inflammatory comments by public officials negated the possibility of seating an unbiased panel of jurors.
The right to an impartial jury and a fair trial is guaranteed to every defendant. See La. Const. art. I, § 16; State v. Sparks, 88-0017, p. 15 (La.5/11/11), 68 So.3d 435, 456, cert. denied, — U.S. -, 132 S.Ct. 1794, 182 L.Ed.2d 621 (2012); State v. Lee, 05-2098, p. 32 (La.1/16/08), 976 So.2d 109, 132; State v. Bell, 315 So.2d 307, 309 (La.1975). To effect this guarantee, the law provides for a change of venue when a defendant establishes that he or she will be unable to obtain an impartial jury or a fair trial at the place of original venue. Sparks, 88-0017 at 15, 68 So.3d at 456; Lee, 05-2098 at 32, 976 So.2d at 132; Bell, 315 So.2d at 309.
| n Changes of venue are governed by La.C.Cr.P. art. 622, which provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
In exceptional circumstances, prejudice against a defendant may be presumed. See State v. David, 425 So.2d 1241, 1246 (La.1983) (“[Ujnfairness of a constitutional magnitude will be presumed in the presence of a trial atmosphere which is utterly corrupted by press coverage or which is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob.”) Otherwise, it is the defendant’s burden to demonstrate actual prejudice. State v. Manning, 03-1982, p. 7 (La.10/19/04), 885 So.2d 1044, 1061; State v. Vaccaro, 411 So.2d 415, 423-24 (La.1982).
To meet this burden, a defendant must prove more than mere public general knowledge or familiarity with the facts of the case: he must demonstrate the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case. State v. Clark, 02-1463, p. 18 (La.6/27/03), 851 So.2d 1055, 1071; State v. Frank, 99-0553, p. 14 (La.1/17/01), 803 So.2d 1, 15. A defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue simply by showing a general level of public awareness about the crime; rather, he must show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. Clark, 02-1463 at 17, 18, 851 So.2d at 1070, 1071. Whether a defendant has made the requisite showing of actual prejudice 112is a question addressed to the district court’s sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion. Sparks, 88-0017 at 16-17, 68 So.3d at 457; Lee, 05-2098 at 33, 976 So.2d at 133; Clark, 02-1463 at 17, 851 So.2d at 1071.
In Bell, supra, this court enumerated several factors relevant to the district court’s determination of whether to order a change of venue. These factors include: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the *299 trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. Bell, 315 So.2d at 311. In setting out these factors, this court emphasized that in deciding whether to change venue, the district court must extend its focus beyond the prejudices and attitudes of individual venire persons. The defendant must be allowed to show that, even if it would be possible to select a jury whose members were not subject to a challenge for cause, prejudice or influences exist within the community at large that would affect the jurors’ answers during voir dire or the witnesses’ testimony, or that for any other reason, a fair and impartial trial could not be obtained in that venue. Clark, 02-1463 at 16-17, 851 So.2d at 1070; Bell, 315 So.2d at 313. The district court’s ultimate determination must rest on the community’s attitude toward the defendant. Clark, 02-1463 at 17, 851 So.2d at 1075.
In reviewing a denial of change in venue, the primary task of the court is to inquire as to the nature and scope of publicity to which prospective jurors in a |1scommunity have been exposed and examine the lengths to which a court must go to impanel a jury that appears to be impartial in order to ascertain whether prejudice existed in the minds of the public which prevented the defendant from receiving a fair trial. Clark, 02-1463 at 18, 851 So.2d at 1071. In performing this review, courts must distinguish largely factual publicity from that which is invidious or inflammatory, as the two present real differences in the potential for prejudice. Id. While, ultimately, there is no bright line test for ascertaining the degree of prejudice existing in the collective mind of the community, the seven Bell factors help facilitate the inquiry. Sparks, 88-0017 at 18, 68 So.3d at 457; Frank, 99-0553 at 16, 803 .So.2d at 16. In addition, courts have examined the number of jurors excused for cause for having a fixed opinion as another gauge of whether prejudice exists in the public mind. Clark, 02-1463 at 18, 851 So.2d at 1071; Frank, 99-0553 at 15, 803 So.2d at 15.
In the present case, a review of the Bell factors, in conjunction with the foregoing precepts, demonstrates the district court did not abuse its discretion when it denied the defendant’s motion for change of venue.
1. Nature and degree of pretrial publicity
In support of his motion for change of venue, the defendant filed into evidence over 200 pages of newspaper articles, online comments from the public, and transcripts of television coverage related to the crimes, in addition to multiple DVDs containing recordings from all of the major local media outlets. These items reveal that media scrutiny in the days following the commission of the crimes was both extensive and comprehensive. During an approximately two-month period following the crimes, the murders garnered front-page newspaper coverage on multiple dates. Some of the language employed by the media, although factually accurate, was 114 emotionally charged. For example, newspaper coverage the morning following the crimes described how, in a “horrific scene [that] unfolded shortly before 5 p.m. in the Tall Timbers subdivision,” “a Pearl River area man ambushed his family.” Paul Rioux and Bruce Hamilton, Wife and son killed; daughters wounded, The Times Picayune, April 19, 2007, at A-l. Subse *300 quent coverage outlined “[a]n alleged history of physical abuse and threats” on the defendant’s part, including “a history of violence against others” that was not documented at trial. Chad Hebert, String of threats reaches tragic end, St. Tammany News, April 20, 2007. Details of the crimes were recounted and documents related to the crimes- were quoted in full. For example, above the headline, “Woman’s plea for help was too late,” one newspaper quoted an excerpt from Adrienne’s handwritten request for a restraining order.[6] Rioux and Hamilton, Woman’s plea for help was too late, The Times Picayune, April 20, 2007, at A-l. Other coverage focused on the victims, describing Adrienne as someone who “could see the silver lining in any situation,” “a good friend, outstanding mother and a good person.” Joe Luna, A tragic tale of lost lives, St. Tammany News, April 23, 2007.
Notwithstanding the extensive media coverage in the two-month period that marked the immediate aftermath of the crimes, the record of the voir dire examination paints a different picture of the community’s collective knowledge and sentiment at the time of trial which occurred approximately 28 months after the shooting. Of the 123 potential jurors who were questioned individually, 60 were excused for various reasons, including medical and personal reasons, preconceived convictions regarding |,fithe death penalty and preformed opinions as to the defendant’s guilt. Of the remaining 63 venire persons, 36 individuals, or approximately 57% of the remaining pool, had no knowledge of the case outside of the facts gleaned during the early stages of voir dire.
As explained previously, a defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a venue challenge merely by showing a general level of public awareness about the crime. Manning, 03-1982 at 9, 885 So.2d at 1063; State v. Thompson, 516 So.2d 349, 352 (La.1987). In this case, the record demonstrates that of the 63 prospective jurors examined concerning their familiarity with the case, approximately 43% responded they had some exposure to it. This percentage is comparable to, and in some instances considerably smaller than, that present in other cases in which this court has found no abuse of discretion in a district court ruling denying a motion for change of venue based on the number of prospective jurors familiar with the facts of the case. See, e.g., Lee, 05-2098 at 34, 976 So.2d at 133 (123 of 125 prospective jurors (98.4%) were “at least vaguely familiar” with the case through media accounts or informal private conversations); Clark, 02-1463 at 21, 851 So.2d at 1073 (78 of 124 venire members (62.9%) responded that they had “some exposure” to the case); Frank, 99-0553 at 16-17, 803 So.2d at 16-17 (110 of 113 venire members (97.3%) had been exposed to “some kind of publicity surrounding the case” while 89% of the prospective jurors indicated that they had been exposed to information about the case on more than one occasion or from multiple sources); State v. Hoffman, 98-3118, p. 9 (La.4/11/00), 768 So.2d 542, 555 (72 of 90 prospective jurors (80%) “had awareness of the case before trial”); State v. Connolly, 96-1680, p. 5 (La.7/1/97), 700 So.2d 810, 815 (although 120 of 139 potential jurors (86.33%) possessed some knowledge of the crime, most had only a *301 vague recollection of the surrounding facts).
Moreover, of the 27 prospective jurors who expressed some knowledge of the case, most had only a vague recollection of the events, consisting largely of factual information, ie., that the incident arose out of a domestic dispute and involved the shooting of the accused’s wife and children. And, those who actually served on the jury assured the court they would be able to decide the case based solely on the evidence presented at trial.
2. Connection of government officials with publicity
The defendant asserts that St. Tammany Parish officials made inflammatory comments to the media that only served to exacerbate the extensive pretrial publicity and, in the process, irretrievably prejudice his ability to receive a fair trial in that parish. To illustrate this point, he cites statements by the district attorney to the press, explaining that the crime “is one of the most gruesome, heartbreaking cases I have ever seen.... I’m very disturbed at the brutality involved.” Rioux and Hamilton, Suspect booked with murders, The Times Picayune, April 21,2007, at A-9. He also points to the district attorney’s comments regarding his “very easy decision” to seek the death penalty. The district attorney explained to reporters that “the slayings were so gruesome, some sheriffs deputies who worked the incident are receiving counseling.” Charlie Chap-pie, Death penalty sought for dad, The Times Picayune, May 25, 2007, at A-l and A-8.
The district attorney was not the only public official to be quoted by the press. The defendant complains that comments by the St. Tammany Parish sheriff were similarly inflammatory and stoked parish-wide sentiment against him. According to the defendant, the sheriff told reporters: “As hard as it is to think about someone | ,7killing his wife, to turn on your young son and gun him down in the street defies anything I could possibly imagine.” Rioux and Hamilton, Wife and son killed; daughters wounded, The Times Picayune, April 19, 2007, at A-20. In addition, according to the media, the sheriff reported that the defendant “did everything he could to deceive us in order to make a getaway,” and “fully confessed,” comments that the defendant maintains only fueled the negative predisposition of parish residents toward him. Rioux and Hamilton, Woman’s plea for help was too late, The Times Picayune, April 20, 2007, at A-10; Arrest warrant had been issued for suspect before wife and son killed, WWLTV broadcast, April 19, 2007.
Indeed, the defendant accuses St. Tammany Parish officials of taking affirmative steps to encourage media involvement in this case. Specifically, he points to the decision of authorities to inform the media of the defendant’s extradition to St. Tammany Parish and to allow the press to question the defendant as he was being escorted into the sheriffs office for booking.[7] He likewise complains of the later decision to allow the press to film the defendant, handcuffed and in his prison garb, being led into and out of the courtroom for his 72-hour hearing. This conduct on the part of government officials, the defendant argues, coupled with their gratuitous comments, far exceeds the benign commentary involving “procedure and *302 court proceedings” found unobjectionable in Lee, 05-2098 at 87, 976 So.2d at 135, and contributed to a community-wide prejudice against him.
However, even a cursory review of the defendant’s exhibits reveals that the complained of comments by public officials all occurred before June 11, 2007. At |18a hearing on that date, the defendant pleaded not guilty and the district court imposed a gag order prohibiting all participants from making public statements about the ease. No further comments from public officials were issued after June 11, 2007. As a result, the only comments made by public officials connected with the case occurred some 28 months before trial. Given the imposition of the gag order to prevent any further comments by officials and the extent of time between the publication of the comments and the trial, the defendant’s argument that comments by parish officials created such a hostile environment that he could not receive a fair trial in St. Tammany Parish is simply not supported by the evidence. See and compare, Clark, 02-1463 at 23, 851 So.2d at 1074 (The imposition of a gag order coupled with an approximate 20-month lapse between comments by public officials and trial did not satisfy the burden of proving comments prejudiced the defendant’s right to a fair trial.).
3. Length of time between publicity and the trial
As noted, well over two years elapsed between the initial flurry of media reports and the start of James’ trial. Nevertheless, the defendant complains media coverage resumed in the days immediately preceding the commencement of trial. Because the jury venire was not sequestered during the voir dire examination and juror selection process, the defendant argues that prospective jurors were potentially exposed to highly inflammatory media reports which either jogged their memories of earlier coverage or exposed them to extrajudicial information for the first time, impermissibly tainting their views of the case.[8]
|1flA review of voir dire examination in this case reveals the district court cautioned prospective jurors against exposing themselves to television, internet, newspapers, radio — “anything of that nature” that might offer coverage of the trial — and instructed them repeatedly that their decisions must be based solely on what they saw and heard in the courtroom. Defense counsel was given the opportunity to question each juror individually as to his or her exposure to media coverage. Those who acknowledged having knowledge of the case from outside sources were questioned further. Those who stated that they would be unable to put pretrial publicity out of their minds were excused. All of the jurors who served on the defendant’s jury confirmed they would be able to put aside any information they gleaned from outside sources and decide the case only on the evidence presented. As a result, the defendant has failed to demonstrate that the length of time between any pretrial publicity and the date of his trial affected his right to an impartial jury.
4. Severity and notoriety of the offense
It cannot be gainsaid that the severity and notoriety of this case was extreme. However, while (as the defendant *303 points out) the district attorney described the crime as the “most heinous” he had encountered,[9] it was not the first capital case to be tried in St. Tammany Parish. See State v. Montejo, 06-1807 (La.1/16/08), 974 So.2d 1238, judgment vacated, 556 U.S. 778, 129 S.Ct. 2079, 178 L.Ed.2d 955 (2009), on remand, 06-1807 (La.5/11/10), 40 So.3d 952, cert. denied, — U.S. -, 131 S.Ct. 656, 178 L.Ed.2d 513 (2010) (in planned attack, defendant broke into home of 61-year-old victim, robbed him, and shot him twice, once in the chest and once in the eye); Hoffman, supra (defendant kidnapped female victim at gunpoint as she was leaving work, robbed and raped her, then forced her to march nude to a makeshift dock where |2nshe was ordered to kneel and was shot in the head, execution style). Nor did this case receive more notoriety than other capital cases. See, e.g., Hoffman, 98-3118 at 6, 768 So.2d at 553 (“offense ‘riveted the public and engendered extensive media coverage in the newspapers, television and radio,’ ” and the trial was listed among the “top ten” news stories of the year[10]). Accordingly, the publicity received by the present case does not appear unprecedented.
5. The area from which the jury was drawn
While the defendant repeatedly characterizes St. Tammany Parish as a small, quiet, suburban community, the 2000 Census shows a population of 191,-268.[11] The jury pool summoned for the case consisted of 500 persons. As noted previously, only 43% of jurors polled had heard something about the case. Moreover, only 11% were removed for having formed a firm opinion as to the defendant’s guilt. With a venire pool so large, this did not cause a dearth of qualified prospective jurors.
6. Other community events that either affect or reflect the attitude of the community or individual jurors toward the defendant
The defendant argues that a significant portion of the pretrial publicity in this case centered around the community-at-large’s attempts to come to grips with the crimes, coverage which, the defendant asserts, demonstrates that prejudice against him permeated the community and prevented him from obtaining an impartial jury. As evidence of community-wide hostility, the defendant points to a number of incidents. He asserts that community members who were witnesses or responders to 121 the crimes became prominent figures in the media, garnering front page attention.[12] He argues that the crimes became a galvanizing force for a focus on *304 domestic violence issues,[13] and he notes that the community rallied to support the surviving Magee children, setting up fund raisers in honor of the two girls, as well a candlelight vigil in the victims’ memories.[14]
Although the defendant is correct in his contention that some of the pretrial publicity in this case focused on the community’s reaction to the crimes, this publicity for the most part occurred in the weeks immediately following the crimes, some 28 months before the case went to trial.[15] Attention directed at the victims and to the larger problem of domestic violence in the aftermath of the crimes does not automatically equate to venire bias against the defendant, particularly where, as here, only 43% of the jurors polled expressed some familiarity with the crimes.
7. Factors likely to affect the candor and veracity of prospective jurors
As direct evidence of community-wide prejudice against him, the defendant points to the testimony of prospective juror Leslie Fields who, when asked during his voir dire examination to characterize the “consensus of the community” as to the Inappropriate punishment for the defendant, responded, “The death penalty. I’m just being honest.” Fields was excused for cause. Yet, the defendant argues that his ability to expose a similar bias on the part of other prospective jurors was hampered because the district court utilized an inadequate jury questionnaire and then impermissibly restricted questioning on the issue of juror bias.
According to the defendant, during the initial round of voir dire, after prospective jurors had filled out a jury questionnaire that failed to “ask some of the most basic questions necessary to an adequate analysis of partiality,” an objection was lodged to the district court’s attempt to “shortcut” the voir dire process by not questioning each juror individually on what he or she knew about the crimes. Ultimately, the district court accepted the defendant’s argument that individualized voir dire would be necessary to ferret out additional opinions on the death penalty and each prospective juror’s exposure to publicity surrounding the case. However, the court cautioned that counsel would need to “be fairly efficient in their questioning” so as not to defeat the utility of the jury questionnaires. The court instructed: “Let’s proceed in this fashion. The two issues on the table are death penalty and publicity.... Counsel, you’ll both be given the opportunity to ask questions as you feel appropriate.”
The defendant cites the examination of prospective juror Ellen Besson as an illustration of the damaging impact of the district court’s restricted voir dire. After indicating through her questionnaire that she knew something about the case, Bes- *305 son informed the court that her grandson had attended the same daycare where Adrienne was employed and that she had learned additional details of the crime from newspapers, the internet, and television. Upon confirming that she had followed | ^¡“fairly extensive media coverage about the case at the time the case occurred,” the district court inquired:
THE COURT: One of the instructions the Court will give you is the only thing you’re to consider is the evidence you hear here in the courtroom. You’re only to consider what you hear and see and learn here in the courtroom. Would you be able, while I know you can’t be like a blackboard and completely erase anything from your mind, would you be able to assure the Court and counsel for both the State and the Defense that you would put any of those facts out of your mind in deciding this case and only decide the case based on what you hear here in court?
BESSON: Yes, sir.
The district court then reiterated its pri- or question, rephrasing it slightly to ask Besson if she could decide the case only on the evidence submitted at trial, even if she recalled additional facts about the crimes during the proceedings, and she again responded in the affirmative. The defendant argues that the district court’s reliance on Besson’s assurances that she could be a fair juror, without additional questions directed at any opinions she had formed based on her pre-existing knowledge of the case, impermissibly stymied his ability to assess the reliability of the assurances of impartiality. See Murphy v. Florida, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975), citing Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (“At the same time, the juror’s assurances that he is equal to this task cannot be dispositive of the accused’s rights, and it remains open to the defendant to demonstrate ‘the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.’ ”). As evidence of this fact, the defendant points to subsequent questioning by defense counsel, who upon questioning Besson regarding the details of her exposure to pretrial publicity, [^obtained an admission from this prospective juror that she had formed an opinion that the defendant was guilty because she had read that he confessed. Besson was excused for cause.[16]
The very fact that defense counsel was allowed to question the prospective juror regarding her knowledge and/or bias demonstrates the fallacy in the defendant’s argument that voir dire was inadequate and improperly restricted. Although the defendant attempts to attribute responsibility for the full voir dire to the district court, the record discloses the court only asked preliminary questions, then allowed counsel for both parties to question the prospective jurors further. The record does not reflect any limitation on defense counsel’s ability to explore the knowledge and/or bias of prospective jurors.[17]
*306 In the final analysis, while the record reveals that some jurors possessed a general knowledge of the case, the defendant fails to demonstrate the existence of an overriding prejudice in the community that prevented him from receiving a fair trial. The defendant’s arguments to the contrary notwithstanding, the record reveals that both counsel and the district court directly assessed each juror’s ability to weigh the evidence and disregard any information or knowledge they might have possessed about the facts of the case.[18]
| 2sAs noted above, this court has affirmed several rulings denying a change of venue in cases in which a similar percentage of jurors expressed a familiarity with the facts. See Clark, 02-1463 at 21, 851 So.2d at 1073; Hoffman, 98-3118 at 9, 768 So.2d at 555; Connolly, 96-1680 at 5, 700 So.2d at 815. More importantly, in this case, the percentage of prospective jurors excused for cause on ground of bias (13 of 123 prospective jurors examined or 11%) suggests that widespread knowledge of the crime in the community had not so tainted the venire that a fair trial in St. Tammany Parish was unlikely. In fact, the percentage of exclusions does not even approach a threshold showing of community-wide prejudice. See Murphy, 421 U.S. at 803, 95 S.Ct at 2037-38 (that 20 of 78 venire persons examined were excused because of their opinion about the defendant’s guilt “may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.”); see also Lee, 05-2098 at 34, 976 So.2d at 133 (even assuming that 16 cause challenges should have been granted by the district court and that the percentage of jurors excluded because of fixed opinions as to the defendant’s guilt rose from 32% to 44%, the court found “these numbers consistent with other similarly situated cases in which venue was not changed.”); State v. Wilson, 467 So.2d 503, 513 (La.1985) (although 24 of 39 prospective jurors examined had heard about the crime, only four were excused on grounds of bias, a percentage too low to support a finding of collective community prejudice sufficient to warrant change of venue); State v. Rodrigue, 409 So.2d 556, 559 (La.1982) (although 26 of 30 prospective jurors examined in mock voir dire had heard about the case, only 9 had fixed opinions of defendant’s guilt; change of venue not warranted).
[¡⅜⅛ sum, based on the record below, the defendant has failed to demonstrate that the district court abused its discretion when it denied his motion for a change of venue. The defendant’s assignments of error numbers 5 and 6 lack merit.
B. Voir Dire Challenges for Cause
In assignments of error numbers 11 and 12 and supplemental assignment of error number 2, the defendant asserts the district court erred in denying his challenges for cause of prospective jurors Stephanie Thornton, Wesley Goostrey, and Faith Stanton, and of jurors Ward Theriot and Mark Audibert. In doing so, the defendant argues, the district court improperly restricted defense counsel’s voir dire examination of Goostrey and Audibert.
Louisiana Const, art. I, § 17 guarantees to a defendant the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The *307 number of peremptory challenges granted a defendant in a capital case is fixed by law at 12. See La.C.Cr.P. art. 799. When a capital defendant uses all 12 of his peremptory challenges, an erroneous ruling of a district court on a challenge for cause that results in depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence. State v. Campbell, 06-0286, p. 70 (La.5/21/08), 983 So.2d 810, 856; State v. Juniors, 03-2425, pp. 7-8 (La.6/29/05), 915 So.2d 291, 304; State v. Cross, 93-1189, p. 6 (La.6/30/95), 658 So.2d 683, 686. In such an instance, prejudice is presumed. Campbell, 06-0286 at 70, 983 So.2d at 856; State v. Robertson, 92-2660, p. 3 (La.1/14/94), 630 So.2d 1278, 1280.
However, an erroneous ruling on a challenge for cause which does not deprive a defendant of one of his peremptory challenges will not provide grounds for a reversal of a defendant’s conviction and sentence. Campbell, 06-0286 at 71, 983 lj,7So.2d at 856. Louisiana law requires that, even where a defendant ultimately exhausts his peremptory challenges, he must use one of his remaining peremptory challenges curatively to remove the objectionable juror or waive the complaint on appeal. See State v. Blank, 04-0204, p. 25 (La.4/11/07), 955 So.2d 90, 113 (“In Louisiana, a defendant must use one of his peremptory challenges curatively to remove the juror, thus reducing his remaining peremptory challenges, or waive any complaint on appeal.” citing Connolly, 96-1680 at 10, 700 So.2d at 818). This requirement, through which the defendant is forced to use a remaining peremptory challenge in order to preserve error in the denial of a challenge for cause, is sometimes referred to as the “strike or waive” rule.
In the instant case, while the defendant ultimately exhausted his peremptory challenges, he declined to use peremptory challenges he had available curatively against prospective jurors Thornton and Stanton and jurors Theriot and Audibert.[19] Applying the “strike or waive” rule would, in this case, result in a waiver of the defendant’s complaint with regard to the district court’s rulings denying his cause challenges to these individuals. As an initial matter the defendant, therefore, challenges the validity and application of the “strike or waive” rule.
|2S1. Forced use of peremptory challenges — the “strike or waive” rule
The defendant correctly notes that the so-called “strike or waive” rule finds its *308 origin in State v. Fallon, 290 So.2d 273 (La.1974). In that case, the defendant challenged for cause a prospective juror who could not read and write the English language. The district court denied the challenge for cause and the defendant assigned the ruling as error on appeal. On review, the court declined to address the merits of the challenge, noting that “defense counsel later accepted Tucker as a juror,” resulting in “a waiver of the challenge.” Fallon, 290 So.2d at 282.
The rule was next applied in State v. Bourque, 622 So.2d 198 (La.1993), wherein the defendant complained on appeal of a district court ruling denying his challenge for cause of a prospective juror who indicated she would not be able to consider the defense of intoxication as a mitigating factor in the penalty phase of the defendant’s capital trial. Citing Fallon, the court ruled: “Since Bourque accepted this juror after his challenge for cause was rejected without exercising his remaining peremptory challenge, he has waived his right to assert this claim on appeal.” Bourque, 622 So.2d at 229-30. Since the decision in Bourque, the “strike or waive” rule has been repeatedly invoked by this court. See, e.g., Connolly, 96-1680 at 10, 700 So.2d at 818; Juniors, 03-2425 at 25, 915 So.2d at 314; State v. Scott, 04-1312, p. 39 (La.1/19/06), 921 So.2d 904, 933-34; Blank, 04-0204 at 25, 955 So.2d at 113-14; Campbell, 06-0286 at 71, 983 So.2d at 856. In fact, it has emerged as the prevailing rule in the jurisprudence.[20]
[^Nevertheless, the defendant complains that the rule — the rationale underlying which has not previously been addressed or fully explained by the court — is inconsistent with La.C.Cr.P. art. 800,[21] which does not contain an exhaustion requirement, and La. Const, art. I, § 17, which guarantees to an accused the right “to challenge jurors peremptorily.” According to the defendant, forcing an ac *309 cused to use a peremptory challenge cura-tively when a challenge for cause is denied impairs the “free exercise” of his full complement of peremptory challenges in violation of both the constitutional and statutory provisions. Furthermore, according to the defendant, it presents an accused with an unacceptable choice between two separate constitutionally protected rights — the right to an impartial jury and the right to challenge jurors peremptorily.
*308 A. A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time, of the ruling. The nature of the objection and grounds therefor shall be stated at the time of the objection.
B. The erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law.
*309 The purpose of the peremptory challenge is to provide both the defense and the prosecution with a greater opportunity to secure a balanced and impartial jury by rejecting a limited number of prospective jurors without cause. Edmonson v. Leesville Concrete Co., Inc., 500 U.S. 614, 620, 111 S.Ct. 2077, 2083, 114 L.Ed.2d 660 (1991) (Peremptory challenges “permit litigants to assist the government in the selection of an impartial trier of fact.”). In Louisiana, the right to peremptory challenges is preserved in the constitution and effected through legislation. See La. Const, art. I, § 17 and La.C.Cr.P. art. 799. When a defendant is forced to utilize a peremptory challenge to correct a district court’s error in denying a challenge for cause and thereafter exercises all available peremptory challenges on other prospective jurors, the effect of the district court’s erroneous ruling on the challenge for cause is to impair the defendant’s ability to change the ultimate composition of the jury selected to try the case. A substantial right of the defendant, guaranteed by the constitution and statutes, is affected. State v. Monroe, 366 So.2d 1345, 1347 (La.1978). On the other hand, when the defendant does not use an available peremptory challenge to correct an erroneous ruling on a challenge for cause, the ability to change the ultimate composition of the jury selected to try the case is not impaired. In other words, unless the peremptory challenge is exercised under compulsion, the right to the “free exercise” of peremptory challenges is simply not impacted. This basic principle is recognized and honored in the “strike or waive” rule: when a defendant is forced to use a peremptory challenge curatively to remove a juror who should have been excused for cause and he exhausts his remaining peremptory challenges, his constitutional and statutory rights are violated and prejudice resulting therefrom is presumed.
"While it is true that the current version of La.C.Cr.P. art. 800 does not contain a requirement that the defendant exhaust his peremptory challenges,[22] the “strike or waive” rule is not predicated on Article 800, but on principles of waiver. See Fallon, 290 So.2d at 282 (“[DJefense counsel later accepted Tucker as a juror,” resulting in “a waiver of the challenge.”); Bourque, 622 So.2d at 229-30 (“Since Bourque accepted this juror after his challenge for cause was rejected without exercising his remaining peremptory challenge, he has waived his right to assert this claim on appeal.”). In other words, the rule finds its roots in the basic principle that a defendant should not be able to object on appeal to the seating of a juror he was entirely able to prevent. Armed with knowledge that he has available the means of preventing an objectionable juror from being seated, the defendant’s failure to use that means is deemed a knowing relinquishment, and waiver, of the right to complain of the juror’s seating on appeal.
*310 The defendant posits that application of the “strike or waive” rule conflicts with and undermines his right to an impartial, jury where the wrongful denial of a cause challenge results in the seating of an impartial juror, regardless of whether a peremptory challenge is used to remove him. But, as noted above, the right to an impartial jury and the right to peremptory challenges are not mutually exclusive; rather, the exercise of peremptory challenges is a means of effectuating and facilitating an impartial jury. See Frazier v. United States, 335 U.S. 497, 505, 69 S.Ct. 201, 206, 93 L.Ed. 187 (1948) (“[T]he right [to peremptory challenges] is given in aid of the party’s interest to secure a fair and impartial jury, not for creating ground to claim partiality which but for its exercise would not exist.”). Thus, it is simply a matter of sound policy to require a defendant to help himself by using his peremptory challenges to ensure this end.
Finally, the defendant suggests that abstaining from the “strike or waive” rule in Louisiana would not present a “novel proposition,” pointing out that under federal law, courts have declined to read a “strike or waive” rule into Fed. R.Crim.P. 24(b), Lathe federal rule governing the use of peremptory challenges. See United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). While it is true federal practice does not require defendants to expend curative peremptory challenges to preserve the erroneous denial of a cause challenge for review, this is not the practice in many, if not most, jurisdictions.[23] Abandoning the now firmly entrenched rule in Louisiana would not, in our view, serve the ends of justice. Rather, it would undermine the salutary goal of avoiding the situation whereby a defendant could stand by silently while an objectionable juror is seated and then, if the verdict is adverse, obtain a new trial.[24]
Finding no constitutional or statutory infirmity in the “strike or waive” rule, this court declines the defendant’s invitation to retreat from the present rule which requires a defendant to exhaust his peremptory challenges and to use one of those challenges curatively against a prospective juror whom the district court refuses to remove through a cause challenge in order to preserve the alleged error on appeal.
Since the defendant exhausted his peremptory challenges, but declined to use (or did not have to use) any of his remaining challenges curatively against jurors Theri-ot and Audibert and prospective jurors Thornton and Stanton, his complaints as to the district court’s rulings denying cause challenges to these individuals are laswaived.[25] As a result, we need only review the district court’s denial of his challenge for cause to prospective juror Goostrey.
2. Wesley Goostrey
The defendant asserts that the district court wrongly denied his cause challenge *311 to prospective juror Goostrey because Goostrey demonstrated an inability to consider the mitigating circumstance of intoxication.[26]
The district court conducted voir dire in this case in a bifurcated manner, initially calling prospective jurors in groups of 20 at a time and questioning them individually about their opinions regarding the death penalty, their prior knowledge of the case (including exposure to media coverage), and any opinions they might have formed regarding the case based on prior exposure.[27] The attorneys explored these issues further in open court, posing specific questions and scenarios to the prospective jurors, including their ability to consider conditions such as mental illness and intoxication as mitigating circumstances.[28]
When questioned as to his opinion regarding intoxication as a mitigating circumstance, Goostrey responded as follows:
Jj4[DEFENSE COUNSEL]: Would the fact that a person guilty of first degree murder was intoxicated at the time, would that make any difference to you?
MR. GOOSTREY: No.
[DEFENSE COUNSEL]: So you would not consider that in mitigation?
MR. GOOSTREY: I would consider that. It’s, again, his choice.
[DEFENSE COUNSEL]: So you feel that since a person makes a choice to become intoxicated, that you could not consider that in mitigation as to whether or not to give the death sentence?
MR. GOOSTREY: I feel you’re responsible for whatever condition you’re in.
The state then requested that the court read the instruction on mitigating circumstances to Goostrey. At the conclusion of the instruction, the district court asked Goostrey: “Would you consider those [factors as mitigating factors] in reaching your decision as to death or life?” Goostrey responded: “Sure.” Defense counsel then asked permission to “add a couple of other questions.”
[DEFENSE COUNSEL]: Sir, when you say “consider” do you mean really consider? Or when you say you will consider that, in light of what you told me earlier, you’d consider it for a second and then just blow it off?
MR. GOOSTREY: If it can be proven to me one way or the other.
[DEFENSE COUNSEL]: So if intoxication can be proven then you would consider it?
MR. GOOSTREY: Sure.
| .^Defense counsel challenged Goostrey for cause, arguing that he clearly articulated his inability to consider intoxication as a mitigating factor and only qualified his response in an effort to say what he “think[s] the Court wants to hear.” The state countered that, after hearing the full instruction from the judge, Goostrey understood the role of intoxication as a miti *312 gating factor and indicated he would consider it during deliberations. The district court overruled the challenge.[29]
As a general rule, an individual who will not consider mitigating evidence relevant to the character and propensities of the defendant is not competent to serve as a juror. See State v. Miller, 99-0192, pp. 8-9 (La.9/6/00), 776 So.2d 396, 403 (a “juror must be willing to consider mitigating evidence relevant to the character and propensities of the defendant (which is the focus of a capital sentencing hearing) and must be willing to fairly consider a life sentence”). However, there is no statutory or legal presumption in favor of any penalty or any mitigating circumstance and individual jurors often have their own inchoate or unarticulated predispositions. State v. Lucky, 96-1687, p. 7 (La.4/13/99), 755 So.2d 845, 850. Such personal predispositions do not offend the law, provided they do not “substantially impair” the juror’s duty to follow the law. Id. For that reason, a prospective juror’s seemingly prejudicial response demonstrating a’ personal predisposition is not grounds for an automatic challenge for cause and a district court’s refusal to excuse him or her on grounds of impartiality is not an abuse of discretion if, after further questioning, the prospective juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. State v. Kang, 02-2812, p. 5 (La.10/21/03), 859 So.2d 649, 653; State v. Lee, 559 So.2d 1310, 1318 (La.1990). A challenge for cause should be granted, however, even when a prospective juror declares his or her ability to remain impartial if the juror’s responses, as a whole, reveal facts from which bias, prejudice, or inability to render a judgment according to law may be reasonably inferred. Juniors, 03-2425 at 9, 915 So.2d at 305; State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990). When assessing whether to grant a challenge for cause, the district court must look at the juror’s responses during his or her entire testimony, not just “correct” isolated answers or, for that matter, “incorrect” isolated answers. Sparks, 88-0017 at 24, 68 So.3d at 461; Lee, 559 So.2d at 1318. Because it has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning, the district court is vested with broad discretion in ruling on challenges for cause and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. Kang, 02-2812 at 7, 859 So.2d at 654; see Juniors, 03-2425 at 9, 915 So.2d at 305; Cross, 93-1189 at 7 (La.6/30/95), 658 So.2d at 686.
In this case, a review of the entire voir dire examination reveals that the district court did not abuse its discretion in denying the defendant’s challenge for cause of Goostrey. While Goostrey initially indicated the fact of intoxication would not factor in his consideration of the appropriate penalty, after the district court recited the full jury instruction on the matter, including the fact that “it would be required of you to consider that at the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease, mental defect, or intoxication,” Goostrey affirmatively stated that he could comply with the *313 law’s mandate. While defendant argues that Goostrey’s response to the district court’s question as to whether he could |S7consider intoxication as a mitigating circumstance was “half-hearted,” Goostrey’s responses to defense counsel’s follow-up questions confirm that he did indeed understand the law and was willing to follow it, including the instruction that he consider, if proved, intoxication as a mitigating circumstance.
The defendant avers, however, that the district court impermissibly limited the number of follow-up questions he was permitted to pose to Goostrey and this limitation hindered his ability to fully explore the prospective juror’s views on intoxication as a mitigating circumstance. A review of the voir dire record undermines that contention. The record demonstrates the defendant concluded his questioning of Goostrey. The state then asked the district court to provide the prospective juror with the relevant jury instruction in an effort to place the intoxication defense in its proper context. After Goostrey affirmatively indicated that he could follow the law as explained in that instruction, defense counsel requested to be allowed to “add a couple of other questions.” The district court permitted counsel to ask two questions and he did. There is no indication in the record that additional questioning was desired and, in brief to this court, there is no indication what, if any, additional questions could or would have been posed. Contrary to the defendant’s contention, the record reveals a rather pointed and complete examination of Goostrey on the topic of intoxication as a mitigating circumstance. At any rate, there was no objection to any perceived limitation on questioning, resulting in a waiver of any alleged error. See La.C.Cr.P. art. 841.
The district court found that after some initial confusion prompted, in part, by questioning on intoxication alone without the accompanying jury instruction,[30] lasGoostrey’s responses as a whole indicated a willingness to consider intoxication as a mitigating circumstance. Based on our review of the entire colloquy, we cannot say the district court abused its discretion in making that determination. See and compare, Lucky, 96-1687 at 8; 755 So.2d at 851 (wherein the court approved the denial of a challenge for cause when a juror stated he would consider mitigating evidence, but would require substantial evidence in mitigation in order to be inclined to recommend a life sentence); State v. Roy, 95-0638, p. 13 (La.10/4/96), 681 So.2d 1230, 1239 (wherein the court refused to overturn the district court’s denial of a challenge for cause to a juror who initially stated he would not consider the statutory mitigating circumstance of intoxication, even if so instructed by the court, but ultimately agreed he would consider it and give appropriate weight “depending on the case.”).
Accordingly, the defendant’s assignments of error numbers 11 and 12 and supplemental assignment of error number 2 lack merit.
C. Admission of Evidence — Letter and Statement
In assignments of error numbers 9 and 10 and supplemental assignment of error number 1, the defendant maintains that the district court violated his state and federal constitutional rights to confront witnesses against him, to due process, to a fair trial and to a reliable sentencing hear *314 ing when it admitted two items into evidence: (1) a letter authored by Adrienne approximately one month prior to her demise; and (2) testimony from Tracy recalling Adrienne’s statements to her on the Sunday before Adrienne’s death. We will address the admissibility of each of the items of evidence in turn.
lafll. Adrienne Magee’s Letter
The state and the defense pressed upon the jurors two very different scenarios leading up to the defendant’s murderous assault on Adrienne and their children. For the state, the shooting deaths of Adrienne and Zack and the attacks on S.M. and L.M. were the culmination of the painful breakup of the defendant’s marriage to Adrienne. The defense argued the shootings were the product of the defendant’s rapid descent into depression and addiction to narcotic pain medication, triggered by the undiagnosed illness which left him with severe and debilitating pain in his feet.
In support of its theory of the case, the state opened the guilt phase of the trial by calling Tracy, Adrienne’s cousin, with whom Adrienne and her children had been living at the time of the shootings. Tracy detailed for jurors the early years of the defendant’s marriage to Adrienne and the onset of marital difficulties in 2006, when Adrienne and her children moved into Tracy’s home in Mandeville from the mobile home they had shared with the defendant in Pearl River, Louisiana. During the course of her testimony, Tracy explained that, as the couple’s separation progressed, she encouraged Adrienne to put down on paper her feelings about the unraveling marriage.
According to Tracy, in March 2007, Adrienne sat down and typed a letter to the defendant in which she attempted to express her conflicted emotions. The letter is unsigned, undated, and, apparently, was never sent. Tracy explained, however, that she witnessed Adrienne type the letter, was familiar with its contents and, subsequent to Adrienne’s death, discovered the letter among Adrienne’s belongings. In the letter, Adrienne described her angst and frustration with the couple’s relationship. The letter, addressed to the defendant, begins:
hnI don’t want to hurt you anymore than I have. Even though that seems to be all I do these days. I’ve been thinking a lot lately about every thing we have been talking about. You don’t here [sic] me when I tell you so I thought I would send you a letter. I love you with all my heart, and probably always will. I know every one thinks that I am cheating, but I’m not. This isn’t about anyone else, its about me and you. I’ve been thinking about if I just go back to you would it be ok? Jamie I am so sorry but I can’t. That is not what I want. I don’t have the energy to put into our relationship. That is a full time job and I know its not going to work. Nothing is changed....
The letter continues with a lengthy recitation of the issues and problems that presaged the breakup. At one point, Adrienne explains:
I want you to understand its not just one or two things that needed to be fixed. It’s a million. I know you say you would never touch me again. I would love to believe you and I hope like hell you are over all that, but deep down in my heart I don’t know that you are. I left you when [L.M.] was one because you wouldn’t quit hitting me. You promised if we got back together you would never do it again. You did.... I have issues with the way you kept me locked up.... You would never help me. I didn’t feel like your equal part *315 ner. I felt like your nanny, maid, and whore.... I have problems with the drinking and medicine. Sometimes your [sic] fine with it and others your [sic] not....
The letter concludes with the revelation:
For the first time in a long time I feel good. Yes I am stressed and the kids drive me crazy but I feel ok. Like relieved in a way.... My goal right now is to get a place for my kids to call home and move on with my life. Let me stress not with another man, but with my kids. You can be a part of that. Not in the way you want to though. We will not live together.... I don’t want to cut you out of my life. You a re very important to me. We just can’t be together as husband and wife. I am over that and don’t want to go back to that life.
The state moved to introduce the letter under the “state of mind” exception to the hearsay rule, La. C.E. art. 803(3), offering it to demonstrate the “dynamic” of Adrienne’s relationship with the defendant in March 2007 — the fact that she was moving away from the defendant, becoming more independent, and was disinclined to continue the marriage. The defendant vehemently objected, arguing the letter, which is unsigned, is not verifiable as Adrienne’s work, that Tracy, as current 141 custodian of S.M. and L.M., has a personal interest that calls into question her neutrality, that because it was apparently never sent, it is questionable whether the letter even accurately reflects Adrienne’s state of mind, and, finally, that Adrienne’s state of mind is simply not relevant to this proceeding.
The district court overruled the defendant’s objection to the letter and allowed it to be published to the jury pursuant to La. C.E. art. 803(3), as a statement of Adrienne’s then existing state of mind, emotion, or sensation. Before this court, the defendant argues the district court erred in ruling the letter admissible on three grounds: (1) the letter was not properly authenticated; (2) the letter does not fall within the La. C.E. art. 803(3)’s “state of mind” exception to the hearsay rule because Adrienne’s state of mind was not at issue in this case, and because the letter does not speak to Adrienne’s then existing state of mind, but instead is a rumination on the previous nine years of her life; and (3) the letter is testimonial in nature and, thus, its admission violated the defendant’s right to confront witnesses against him.
As an initial matter, it is noted that authentication of evidence is a condition precedent to its admissibility. La. C.E. art. 901(A). Authentication is a process whereby something is shown to be what it purports to be. See Id; State v. Guillard, 04-899, p. 27 (La.App. 5 Cir. 4/26/05), 902 So.2d 1061, 1080, writ denied, 05-1381 (La.1/13/06), 920 So.2d 233; Newpark Resources, Inc. v. Marsh & McLennan of Louisiana, Inc., 96-0935, p. 5 (La.App. 1 Cir. 2/14/97), 691 So.2d 208, 211, writ denied, 97-0691 (La.4/25/97), 692 So.2d 1094. Pursuant to La. C.E. art. 901(B)(1), the testimony of a witness with personal knowledge may provide the authentication of evidence required for its admission.[31] Cf. State v. Drew, 360 So.2d 500, 518 (La.1978) (“To admit demonstrative evidence at trial, the law requires that the object be identified. The identification *316 can be visual, that is, by testimony at the trial that the object exhibited is the one related to the case.”). In this case, Tracy testified that she stood over and watched as Adrienne typed portions of the letter and read over it when Adrienne finished. From her personal knowledge, she identified the letter (although unsigned and undated) as an original document and denied that any alterations had been made to it. The defendant’s protestations notwithstanding, Tracy’s testimony provided a sufficient foundation to admit the letter as authentic.[32]
Of course, the fact that evidence is found to satisfy the authenticity requirement does not mean it is necessarily admissible. It may be excluded by other rules, such as those relating to hearsay. Pugh, Force, RauLT & TrICHE, HANDBOOK On LoüISIANA Evidence Law, 717 (2010). Hearsay, an out-of-court statement offered to prove the truth of the matter asserted, is generally inadmissible unless it falls within one of the exceptions established by law. See La. C.E. arts. 801(C) and 802.
In this ease, the district court admitted Adrienne’s letter under La. C.E. art. 803(3), the “state of mind” exception to the hearsay rule. Article 803 provides, in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
[[Image here]]
|4S(3) Then existing mental, emotional or physical condition. A statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant’s then existing condition or his future action. A statement of memory or belief, however, is not admissible to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant’s testament.
As explained in Garza v. Delta Tau Delta Fraternity National, 05-1508, 05-1527 (La.7/10/06), 948 So.2d 84, 89, the official comments to this exception point out that it clarifies prior Louisiana law and generally follows the federal rules, with one notable exception. In drafting the article, the legislature borrowed from the approach taken in Alaska and added the phrase “offered to prove the declarant’s then existing condition or his future action.” This insertion was intended to clarify the limited scope of the exception as set forth in State v. Weedon, 342 So.2d 642, 646 (La.1977) (An out-of-court declaration by one person is inadmissible to show what another person did). Garza, 05-1508, 05-1527 at 21, 948 So.2d at 98.
The exception is based on the belief that a spontaneous expression of a déclarant’s condition at the time the statement is made is generally a reliable indicator of the declarant’s state of mind. 2 McCormick On Evidence § 274 (6th ed. 2006) (“[T]he special assurance of reliability for statements of present state of mind rests upon their spontaneity and resulting probable sincerity.”) The exception expressly forbids, however, admission of a “statement of memory or belief to prove the fact *317 remembered or believed,”[33] as such a statement is subject to classic hearsay concerns of memory and narration and, therefore, is inherently unreliable. McCormick § 276; Shepard v. United States, 290 U.S. 96, 105-106, 54 S.Ct. 22, 26, 78 L.Ed. 196 (1938) (“Declarations of intention, casting light upon the future, have been sharply [^distinguished from declarations of memory, pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored”).
Like the note at issue in Garza, the letter from Adrienne the state offered into evidence can be broken down into parts: sections of the letter express Adrienne’s existing state of mind regarding her relationship with the defendant and her determination to establish a life on her own; other sections look backward in time, reflecting on the last nine years of her life and the events that preceded and precipitated her breakup with the defendant. As to those sections of the letter in which Adrienne expresses her then existing belief that the marriage was over and her desire to separate both physically and emotionally from the defendant, the statements are relevant and admissible under La. C.E. art. 803(3) to prove Adrienne’s subsequent acts in the days leading up to her murder and to explain why the immediate antecedent circumstances of the murder unfolded in the way they did; ie., why she obtained a tape recorder to memorialize the defendant’s incessant calls to her telephone, hid her car, sought a restraining order, hired a police detail to watch over the daycare center where she worked, and opened a separate bank account, and why, just hours before her demise, she informed the defendant that she would see him in court on the restraining order, but would not interfere long-term with his weekend visitation with the children. See La. C.E. art. 803(3); State v. Martin, 458 So.2d 454, 461 (La.1984) (A hearsay statement establishing the speaker’s then existing state of mind is admissible to prove the speaker’s subsequent acts).[34]
|^However, given La. C.E. art. 803(3)’s clear limitation that a statement of present state of mind cannot be used to prove the acts of a third party and is not admissible to prove a fact remembered, it is evident that the district court erred in admitting those sections of Adrienne’s letter which recall the abuse, both physical and mental, she ostensibly suffered at the defendant’s hands over the previous years of their relationship. The backward-looking recollection of facts was clearly inadmissible under La. C.E. art. 803(3). Garza, 05-1508 at 22, 948 So.2d at 99 (“The limitation of La. C.E. art. 803(3) could not be clearer: the fact remembered or believed by the declarant cannot be proved by the out-of-court statement, even if the statement otherwise relates to the declarant’s then existing mental or emotional condition or to her future action.”). The district court erred when it failed to *318 redact those sections of the letter dealing with the defendant’s past behavior.
Nevertheless, a trial error does not provide grounds for reversal of a defendant’s conviction and sentence unless it affects substantial rights of the accused. See La.C.Cr.P. art. 921; State v. Johnson, 94-1379, pp: 16-17 (La.11/27/95), 664 So.2d 94, 101-02. The test is whether there is a reasonable possibility the error might have contributed to the conviction and whether the court can declare a belief that the error is harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 22-23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); State v. Green, 493 So.2d 1178, 1185 (La.1986). The reviewing court must find the verdict actually rendered by this jury was surely unattributable to the error. Johnson, 94-1379 at 18, 664 So.2d at 101-02; Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). In this case, the record is replete with evidence leading to this conclusion.
Despite the defendant’s contention that the letter “formed the emotional crux” of the state’s entire prosecution, effectively undermining the defendant’s contention that the murders were a drug-fueled, spontaneous act committed at a time when the defendant was experiencing extreme mental, physical, and emotional distress, there was ample evidence from which jurors could reasonably conclude just the opposite — that the shooting deaths were the angry and calculated culmination of an unraveling marriage.[35] Apart from its inadmissible portions, the letter added little to what the objective facts, as related by Tracy, established: that the marriage was irretrievably broken and that Adrienne was separating herself both physically and emotionally from the defendant at the time she died. While Adrienne may not have sent the letter, the restraining order she had served on the defendant conveyed its message with unmistakable clarity — as did her decision to open a checking account in her own name and the telephone call she made just hours before her death in which she advised the defendant he would not be able to see the children that weekend, but visitation would resume after the court hearing scheduled for the following Wednesday which would simply formalize the arrangement.
As to the inadmissible portions of the letter, particularly those portions in which Adrienne recalled the abuse she had suffered at the defendant’s hands, their admission was certainly harmless in the context of the other evidence offered at trial, most notably, the recordings of the telephone messages the defendant left on Adrienne’s cell phone in the days preceding the shootings. In those calls, beginning 147on Sunday, April 15, 2007, and continuing through the following Tuesday, the defendant bombarded Adrienne’s cell phone voice mailbox with a stream of threatening and otherwise unpleasant messages — messages which cajoled, cursed, and directly threatened her life. The recordings were played to the jurors, offering them an opportunity to judge for themselves how controlling and abusive the defendant may have been toward his wife. In addition, the jurors were presented with the sworn, notarized “Petition for Protection from Abuse” filed by Adrienne on Monday, April 16, 2007. In that petition, Adrienne alleged the defendant “punched my [car] window, making threats he would see me this week without my children. Scaring my children.” She con *319 fessed, “I feel my life could be in danger,” and further averred the defendant “has a history of physically abusing me.”
Considered in the context of this evidence, any error in the admission of the letter was clearly harmless and the verdict actually rendered by the jury was surely unattributable to that error.
2. Tracy Delatte’s Testimony Recalling Adrienne’s Statements
During her testimony, Tracy related the events of Sunday, April 15, 2007, when Adrienne traveled to the Abita Springs ballpark to retrieve the children from the defendant after the children spent the weekend with him attending the Ponchatoula Strawberry Festival. Tracy testified that when Adrienne returned from the ballpark with the children, she was visibly upset and shaking. She confirmed that the children likewise seemed upset and that young Zack uncharacteristically “messed” on himself when he returned to the house. Tracy explained that the family started to discuss the events that had transpired at the ballpark when Adrienne began receiving “unpleasant” voice messages from the defendant on her cell phone. At that point, according to Tracy, Adrienne confessed her emotional reaction to the events of the |48evening, a reaction which Tracy confirmed as matching Adrienne’s outward appearance.
Having laid this factual predicate, the state moved for permission to elicit from Tracy testimony, pursuant to La. C.E. art. 808(3), as to what Adrienne said “about her emotional condition and why her emotional condition was what it was.” Over defense objection, the district court allowed Tracy to testify to Adrienne’s state of mind.
Q: What did she tell you about how she was feeling?
A: She was very scared and nervous. She said she was afraid that he was going to hurt her.
The defendant argues that the district court erred in admitting this highly prejudicial hearsay testimony under the auspices of the state of mind exception. According to the defendant, Adrienne’s state of mind was not relevant to any issue in the case and the statement was elicited solely to prove the defendant acted in conformity with the statement, a purpose plainly forbidden by La. C.E. art. 803(8) and the jurisprudence of this court.
This court has recognized that extrajudicial statements of a decedent made shortly before the crime that are relevant to the circumstances immediately preceding the murder are admissible under the state of mind exception. Admission in this instance is “based upon the expedient rule sometimes relied upon in homicide cases that ‘conduct or declarations of the decedent shortly before his killing may sometimes be admissible as tending to show the immediately antecedent circumstances explanatory of the killing and connecting the accused with it.’ ” State v. Weedon, 342 So.2d 642, 646 (La.1977), quoting State v. Raymond, 258 La. 1, 245 So.2d 335, 342 (1971) (Tate, J., concurring).
Lain this case, Adrienne’s declaration to Tracy on Sunday night that she was afraid of the defendant was clearly part of the immediate antecedent circumstances of the homicide, “explanatory of the killing and connecting the accused with it.” Id. Those circumstances began with whatever happened between Adrienne and the defendant at the Abita Springs ballpark on that Sunday afternoon when the defendant delivered the children to Adrienne. It led to and explained the measures taken by Adrienne in the brief period which ensued, culminating in her death, including recording the defendant’s voice messages, hiding *320 her car, seeking the restraining order, and hiring a police detail to watch over the daycare center. Consistent with Raymond,,[36] the district court did not err in admitting Tracy’s testimony as an exception to the hearsay rule pursuant to La. C.E. art. 803(3).
Because the district court did not err in admitting Tracy’s testimony regarding Adrienne’s emotional state on that Sunday evening or those portions of Adrienne’s letter that disclosed her then existing state of mind regarding her relationship with the defendant and her desire to establish a life separate from him,[37] and because any error |50in the admission of those portions of Adrienne’s letter that detailed the defendant’s past conduct was clearly harmless, the defendant was not deprived of the right to confront witnesses against him, to due process, and to a fair trial and a reliable sentencing hearing. The district court’s evidentiary rulings do not undermine the reliability of the jury’s verdict in this case. The defendant’s assignments of error numbers 9 and 10 and the supplemental assignment of error number 1 lack merit.
D. Admission of Evidence — Photographs and Testimony
In assignments of error numbers 7 and 8, the defendant maintains the state submitted highly inflammatory evidence to the jury in the form of repetitive, graphic testimony and gruesome photographs, the prejudicial nature of which far outweighed any probative value for which they were offered. He avers that the district court’s rulings admitting this evidence violated his right to due process, an impartial jury, a fair trial, and a reliable sentencing hearing.
1. Graphic Testimony
As part of its case-in-chief, the state presented testimony from neighborhood residents and police investigators who witnessed the events on that afternoon as they unfolded. Thus, Bryars was called to describe how, sitting in his kitchen, hearing the screeching of tires and the clashing of metal, he rushed to his driveway, observed a man exit a truck with a gun, heard gunshots, witnessed the shooter flee the scene, observed the injured victims, and assisted the defendant’s daughters out of the damaged car and into *321 his garage. Likewise, Sisung was called to recount how she, too, heard gunshots and rushed outside her home, only to discover Adrienne’s lifeless body with a “black hole in her head,” young Zack gasping for air, and the two girls in the damaged car, who, along with Bryars, she helped move to a safer location. Tyler, who was riding his bicycle to a friend’s house, was also called by the state. He |S1 recalled observing a white truck ram into the rear of a small car and an individual, who he positively identified as the defendant, exit the truck with a shotgun. After fleeing to try to alert neighbors, Tyler described returning to the scene to witness Zack’s last breaths. Finally, at the state’s behest, Officer Palys testified to responding to the call of a shooting, observing the defendant’s truck leaving the subdivision, and coming upon the crime scene. He vividly described the scene, including the victims’ injuries and the efforts of neighbors to resuscitate Zack.
The defendant strenuously objects to the testimonies of these witnesses, arguing that, although some eyewitness accounts from the scene were to be expected, the extent and manner of the testimonies of these witnesses, recounting the victims’ violent injuries and the last heart-wrenching moments of Zack’s life, exceeded legitimate evidentiary purposes, particularly in light of the fact the defendant did not dispute any aspect of the injuries.
As an initial matter, it must be noted that the defendant did not object to the testimony of either Bryars or Sisung at any time during their examinations. Therefore, any assignment of error attached to the testimonies of these witnesses is waived. See La.C.Cr.P. art. 841.
a. Tyler Mendoza
The defendant objected to the state’s calling of Tyler, characterizing his testimony as cumulative, emotional, inflammatory, and irrelevant. The state countered that Tyler’s testimony, while similar in some respects to that of the witnesses who preceded him, differed because the previous witnesses (specifically, Sisung and Bryars) had not positively identified the defendant as the assailant.
Louisiana C.E. art. 401 defines relevant evidence as “evidence having any tendency to make the existence of any fact that is of consequence to the determination |fii>of the action more probable or less probable than it would be without the evidence.” All relevant evidence is admissible, unless prohibited by law or by the constitution. La. C.E. art. 402. Relevant evidence may be excluded, however, if its probative value is outweighed by “the danger of unfair prejudice.” La. C.E. art. 403. The district court is accorded great discretion in determining whether evidence is relevant and, absent a clear abuse of discretion, rulings on relevancy will not be disturbed on appeal. State v. Stowe, 93-2020, p. 7 (La.4/11/94), 635 So.2d 168, 173.
In his testimony, Tyler positively identified the defendant as the person who exited the driver’s side of the white truck with a shotgun. As the only testimony identifying the defendant as the individual with the shotgun who stalked and shot the victims, Tyler’s testimony was clearly relevant in helping the state prove the defendant was the assailant and possessed the specific intent to kill the victims. Although his testimony may have overlapped to some degree with that of Sisung and Bryars, the defendant fails to demonstrate that any prejudice he suffered from the testimony outweighed the relevance of its admission. The district court did not abuse its discretion in admitting Tyler’s testimony.
*322 b. Officer Devin Palys
The defendant’s only objection to the testimony of Officer Palys came when, after describing the location and condition of the mortally wounded Zack, Officer Pa-lys was asked to repeat his observation that the child had attempted to move, catch his breath, and raise himself off the ground.
Q. When he was on the ground, you indicated before that he actually tried, despite his injuries, tried to move?
A. At that point, he was still, he was gasping for air, he was taking deep gasping breathes [sic]. And he had his hands and he was trying to push up.
| aThe defendant objected to this testimony as repetitious: “This is a horrible thing. How many times do we have to listen to him say that he’s gasping for breath?” The district court overruled the objection.
The defendant fails to show how this brief, albeit repetitive, statement was unduly prejudicial. The testimony was relevant in establishing the location and condition of the victims and in describing the scene in the neighborhood immediately following the shooting. Thus, it does not appear the district court abused its discretion in allowing the testimony. Moreover, to the extent the district court may have erred in admitting any of this testimony, including the testimony the defendant did not object to, the error was clearly harmless under the standard articulated in Chapman, supra. The jury’s verdict was surely unattributable to the erroneous admission of any testimony from these witnesses.
2. Gruesome Photographs
The defendant contends that, having stirred the jury’s emotions with the traumatic eyewitness accounts of Adrienne’s and Zack’s wounds, the state added fuel to the fire with the introduction of gruesome photographs, unfairly prejudicing the defendant in the jury’s eyes.
The state received over 60 photographs of the deceased victims from the coroner’s office and approximately 200 photographs of the crime scene from the sheriffs office. Before the coroner testified, the district court entertained the defendant’s motion to exclude the photographs as irrelevant and prejudicial under La. C.E. art. 403. At the outset of the discussion, the state explained the process whereby it winnowed down the photographs to one crime scene photograph of Zack and two crime scene photographs of Adrienne. With regard to the coroner’s photographs, the state explained that duplicative photographs, as well as any photographs depicting |M“cut sections” or “scalp reflection” had been removed, leaving only those photographs that depicted the bodies “in the condition in which they came in, as well as some with hair removal so that the wound and the wound structure could be seen.” The defendant reiterated his objection, arguing the photographs were both prejudicial and unnecessary, as the coroner was certainly capable of describing the wounds to the jury without resorting to gruesome and inflammatory photographs.
The district court ruled:
[T]he Court has reviewed the 22 photographs which have been submitted for consideration by the Court.... The Court is going to exclude seven of those photographs as being duplicitous and unfairly prejudicial to the defendant, i.e., the probative value is not outweighed by the prejudicial effect.... That said, the photographs which are to be allowed to be published to the jury, while certainly graphic in nature and not pleasant view *323 ing, fairly depict the items which the State should be able to and entitled to show, and at the same time respect the defendant’s right to not have them used duplicitously for simply prejudicial value.
We can discern no abuse of discretion in the district court’s ruling.
“Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing, or place depicted.” State v. Sepulvado, 93-2692, p. 7 (La.4/8/96), 672 So.2d 158, 164. A district court’s ruling with respect to the admissibility of photographs will not be overturned unless it is clear the prejudicial effect of the evidence outweighs its probative value. State v. Maxie, 93-2158, p. 11 n. 8 (La.4/10/95), 653 So.2d 526, 532 n. 8.
Even when the cause of death is undisputed, the state is entitled to the moral force of its evidence and post-mor-tem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as the location and placement of wounds, and to provide positive identification of the victim. State v. Koon, 96-1208, p. 34 (La.5/20/97), 704 So.2d 756, 776; State v. Watson, 449 So.2d 1321, 1326 (La.1984); State v. Kirkpatrick, 443 So.2d 546, 554-55 (La.1983). Photographic evidence will be admitted unless it is so gruesome that it overwhelms jurors’ reason and leads them to convict without sufficient other evidence. Koon, 96-1208 at 34, 704 So.2d at 776. The admission of “gruesome photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect.” State v. Broaden, 99-2124, p. 23 (La.2/21/01), 780 So.2d 349, 364, quoting State v. Martin, 93-0285, pp. 14-15 (La.10/17/94), 645 So.2d 190, 198.
The probative value of the photographs in this case distinguishes them from the photographs in State v. Morris, 245 La. 175, 157 So.2d 728 (1963), the only case reversed by this court on grounds of the improper introduction of gruesome photographs. Morris involved the gratuitous introduction of “gruesome and ghastly” photographs depicting the progress of an autopsy in an “increasingly grotesque and revolting manner.” Id. at 730. While Morris also involved a scenario in which the defendant did not dispute the fact he had murdered the victim, the photographs in this case did not approach the gratuitous nature of those in Morris,[38] Here, the photographs merely reflect the injuries suffered by the victims and the condition and location of those injuries on their bodies. The court in this case engaged in a thoughtful and detailed examination of each photograph and excluded 7 of the 22 photographs the state sought to introduce. The defendant shows no abuse of discretion on the part of the district court in admitting the remaining photographs.
The defendant’s assignments of error numbers 7 and 8 lack merit.
|SfiE. Exclusion of Relevant Mitigating Evidence
In assignments of error numbers 1 and 2, the defendant asserts the district court erred in granting a motion in limine prohibiting any witness from testifying as to his or her preference or opinion regarding *324 the appropriate punishment during the penalty phase of trial. The defendant contends the ruling violated his constitutional right to present mitigating evidence by preventing him from offering testimony from his daughters and other family members that they wanted him to receive a sentence of life imprisonment.
On October 1, 2009, just prior to the commencement of trial, the state filed a motion in limine seeking to preclude the questioning of witnesses at the guilt or penalty phase regarding their preferences or opinions as to the appropriate punishment. In that motion, the state argued that the personal opinions, requests, or demands of either the victims’ or offender’s surviving family members and/or associates as to the appropriate penalty to be imposed do not constitute relevant mitigating circumstances within the meaning of La.C.Cr.P. art. 905.5(h).[39] Citing La. C.Cr.P. art. 905.2(A), the state contended the exclusive focus of the capital sentencing hearing must remain “the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact that the crime has had on the victim, family members, friends, and associates.” Relying on a line of jurisprudence from other jurisdictions, the state argued that subjective preferences, demands or opinions for death or life interject an arbitrary factor into the sentencing proceeding and risk subverting the very purpose of the sentencing guidelines, which is to provide a |,^meaningful basis for distinguishing between those cases in which a sentence of death is imposed from those in which it is not.[40]
At the hearing on the motion, the defendant argued that the cases cited by the state are not binding on Louisiana courts and do not provide controlling authority for the position urged. To the contrary, the defendant maintained that Louisiana’s view of permissible evidence in mitigation is “wide open.” The district court rejected the defendant’s argument and granted the motion in limine, reasoning:
Any individual person’s preference as to a penalty in any particular case, whether it be this case involving Mr. Magee or any other criminal case, is not relevant. While perhaps some portion of the victims’ family may prefer one penalty; some portion of the victims’ family may prefer another penalty. Some portions of the defendant’s family may, likewise, be conflicted if convicted.
My opinion or your’s [sic] as to the particular penalty in this case is of no moment. Just as the opinion of any particular witness as to their preference to a penalty is of no moment.
In considering mitigating circumstances, the Court’s going to allow full appropriate questioning relative to aggravating and mitigating circumstances, but not as to preference of any individual witness as to what penalty be imposed.
The Defendant then sought clarification of the court’s ruling:
[DEFENSE COUNSEL]: Your Honor, I’ve been involved in quite a few of *325 these things, and are you saying that a mother cannot get on the stand and turn to the jury and say, “Please do not kill my son”?
THE COURT: No, I’m absolutely not saying that. What I am saying is it will be inappropriate to question any witness as to what do you think the penalty should be in this case.
^[DEFENSE COUNSEL]: For the mother to say, “In my opinion, he shouldn’t get the death penalty.” You would not agree with? You would not want that?
THE COURT: I would allow a mother to testify, “I would not like you to put my son to death” in whatever language she chooses to do that. What I would not allow anyone to do is to invade the province of the jury, which is to say, “What would you think should be the penalty in this case?” That would be inappropriate right there. While you may be able to elicit very much the same information from some witnesses, such as someone’s mother who would most assuredly expect not to wish the death penalty be imposed on her son. That would not be an appropriate question for witnesses because it does invade the jury’s province.
I will, of course, rule on any particular objection, if raised at the time. I think I made clear what my position is. Hopefully, I can avoid interrupting or sustaining objections and not in any way prejudice the defense or the prosecution. I’m not going to allow the prosecution to ask any witness they call what their preference would be.
The defendant argues the district court’s ruling on the state’s motion in limine prohibited him from eliciting powerful, im-pactful testimony from his daughters that they did not want him to be executed and, in the process, violated his constitutional right to present mitigating evidence, in clear contravention of this court’s ruling in Manning, supra.
In Manning, the district court sustained the state’s objections to defense counsel questioning Manning’s mother and sister as to whether they wished the jury to spare Manning’s life. Noting that the Eighth Amendment precludes evidence of Isflthe victim’s survivors’ opinions that the defendant should die for his crime, Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the court nevertheless reasoned that a different rule might obtain with regard to the opinions of the defendant’s family members:
Concerns for an even playing field must yield to the defendant’s constitutional right to present any relevant mitigation evidence. While the Eighth Amendment allows the State to present only a limited amount of victim impact evidence, carefully circumscribed in scope, “[u]nder the aegis of the Eight Amendment [the Supreme Court has] given the broadest latitude to the defendant to introduce relevant mitigating circumstances reflecting on his individual personality, and the defendant’s attorney may argue that evidence to the jury.” Payne, 501 U.S. at 826-827, 111 S.Ct. at 2609. Given the breadth of the defendant’s Eight Amendment right to present any and all relevant mitigating evidence, it would be a difficult rule of law to enforce that the defendant’s family members may restate in exacting detail the extenuating circumstances in the defendant’s background and yet not express their conclusion based on that evidence that the defendant should live despite the severity of his crime.
Manning, 03-1982 at 61-62, 885 So.2d at 1098-99.
*326 While the majority’s conclusion in Manning might, at first blush, appear to support the defendant’s attack on the district court’s ruling in this case, here, the defendant’s daughters share roles as victims, victims’ survivors and family members of the defendant. Testimony regarding their preferences or opinions as to the appropriate punishment could just as easily be deemed admissible under Manning as inadmissible under Payne and State v. Bernard, 608 So.2d 966, 970 (La.1992) (“Evidence of the victim’s survivors’ opinions about the crime and the murderer is clearly irrelevant to any issues in a capital sentencing hearing.”). The conundrum created by these dual roles and the correctness or error of the district court’s ruling with respect to the defendant’s daughters need not be resolved in this case, however.
It appears from the record that the defendant misconstrues the district court’s ruling. The court did not prohibit the defendant from calling witnesses to present| ^mitigating evidence. In fact, the defendant’s mother, father, and stepfather testified on his behalf during the penalty phase of the trial. There is nothing in the district court’s ruling that would have prevented the defendant from calling his daughters to the stand to testify that, despite the horrific events of April 18, 2007, the defendant had been a caring and doting parent who had supported his children and taken them on outings. However, the defendant did not call the children to testify and there is no indication in the record that the district court’s ruling on the motion in limine induced that decision.
The district court made clear in its ruling that it would allow the defendant to present any and all relevant mitigating evidence. The district court’s ruling would have left the daughters free to describe for jurors the specific instances in which the defendant showed himself to be a loving and supportive parent and to outline for the jury any other facts bearing favorably on “the character and propensities of the offender.” La.C.Cr.P. art. 905.2(A). However, for whatever reason, the defendant did not call the girls to the stand.[41] As a result, there is nothing to indicate the defendant’s daughters would have testified in his favor, much less that they would have opined they wished his life to be spared.
Louisiana’s Code of Evidence provides: “Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... [w]hen the ruling is one excluding evidence, the substance of the evidence was made known to the court by counsel.” La. C.E. art. 108(A)(2). Thus, in order to preserve for review an alleged error in a ruling excluding evidence, counsel must make known to the court the substance of the excluded testimony. | This can be effected by proffer, either in the form of a complete record of the excluded testimony or a statement describing what the party expects to establish by the excluded evidence. State v. Adams, 537 So.2d 1262, 1264-65 (La.App. 4 Cir.), aff'd in part, rev’d in part, 550 So.2d 595 (1989).
In this case, the defendant did not make a proffer of the testimony he now claims he was prohibited from eliciting from his daughters — that the girls wished their father to be spared the death penalty. Nevertheless, he contends he fully *327 complied with the dictates of La. C.E. art. 108(A)(2) because, at the time of its ruling, the court was aware of the substance of the evidence. Citing the authors’ notes to La. C.E. art. 103, the defendant suggests that “no formal statement as to the substance of the evidence is required when it ‘was apparent from the context.’ ” HandbooK On Louisiana Evidenoe Law at 343-44, quoting Federal Rule of Evidence 103(A)(2).[42]
According to the defendant, the girls’ wish to have their father receive a life sentence was easily discernible from the record. As proof of this fact, the defendant points to the state’s motion in limine wherein it is alleged:
At different points in time, [L.M.] and [S.M.] have indicated that the defendant’s behavior deserves the death penalty. At other times th[ey] have expressed they will not be involved in the process of his sentencing at all, and at other times have expressed they would have him have life in prison.
The defendant seizes upon this statement, coupled with the timing of the motion (two weeks pretrial) and the state’s admission at the motion hearing that the outcome of the motion in limine would affect the way it tried the case, as an | ^acknowledgment that the testimony of the girls would have been favorable to their father, eliminating the need for a proffer. However, no such conclusion is supported by this statement. Indeed, the state relied on the statement to argue that the opinions of the young preteens “are especially arbitrary” and that sympathy for their situation might cause the jury to “disregard the relevant aggravating and mitigating factors ... in an effort to do what the jury collectively thinks will please the children.” This statement — that the opinion of the children could influence the jury in either direction — scarcely constitutes a judicial admission that the daughters were prepared to offer their opinions on the defendant’s behalf.
In this instance, categorizing or predicting the girls’ possible testimony would require pure conjecture and speculation on the part of this court. Their testimony, excluding their opinions on punishment, could have benefitted or hurt the defendant’s position during the penalty phase of trial. The defendant opted not to call them as witnesses, making their feelings or opinions as to an appropriate punishment impossible to discern from the record. There was no proffer in this regard, probably because defense counsel had not spoken to the children and, like this court on review, was not able to determine what the children would say. Given these circumstances, it is apparent the defendant failed to establish a factual predicate on which to base his argument that the district court violated his right to present mitigating evidence at the penalty phase of the trial.
The defendant was not precluded by the district court’s ruling from calling his daughters to testify in the penalty phase of trial. Because he failed to make the substance of any excluded testimony from the girls known, any error in the district court’s ruling with respect to the testimony of the defendant’s daughters regarding | ffitheir preferences for punishment is waived. As explained by the court in Adams, 537 So.2d at 1265:
The purpose of an offer of proof is to create a record of the excluded evidence *328 so that the reviewing court will know what the evidence was and will thus be able to determine if the exclusion was improper, and if so, whether the improper exclusion constituted reversible error.
In the absence of any indication the defendant’s daughters would have testified in the manner espoused by the defendant, this court is simply unable to opine, with any degree of certainty, whether their testimony was improperly excluded. In short, this court cannot engage in speculation or conjecture as to the merits of an issue which was not properly preserved.
Similarly, the defendant has not demonstrated error in regard to any limitations placed on the evidence from the witnesses who actually testified on his behalf at the penalty phase. Assuming, arguendo, that consistent with Manning, the district court erred by not allowing the defendant’s family members who did testify on his behalf at the penalty phase to express their opinions that the defendant should be spared the death penalty, any error in this regard is clearly harmless.[43]
During the questioning of the defendant’s mother, defense counsel asked if there were any additional comments she would like to make to the jury. She replied:
I love my son. Please don’t put him to death. I think the girls are going to want to know why, one day. And they are going to want to talk to him. And if he is not around, they will never have the closure.
Although the defendant did not elicit similar testimony from his father and stepfather (presumably as a result of the district court’s ruling), their overall | fV1 testimonies paint a sympathetic picture of the violent and tumultuous childhood endured by the defendant, permitting an inference by the jurors that these men preferred life imprisonment over the death penalty as punishment for the defendant. See Manning, 03-1982 at 62, 885 So.2d at 1099 (error in preventing defendant’s mother and sister from testifying they wanted the jury to spare his life harmless because the jury members would have inferred the family members would have expressed a preference for life). The direct testimony from the defendant’s mother, coupled with the sympathetic tone of his other family members, thus, renders any error in the ruling of the district court clearly harmless.
Accordingly, the defendant’s assignments of error numbers 1 and 2 lack merit.
F. Community Impact Evidence
In assignment of error number 4, the defendant avers the district court erred in permitting the state to present evidence regarding the “profound impact” the crime had on members of the community who had no relationship with the victims, in direct contravention of La.C.Cr.P. art. 905.2(A), which limits victim impact evidence to “the impact ... on the victim, family members, friends, and associates.” Specifically, the defendant contends that testimony from responding officer Deputy Donald Plaisance and Tall Timbers resident Michelle Talazac exceeded the scope of permissible victim impact evidence and that the introduction of two photographs — one depicting a flier for a candlelight vigil in memory of Adrienne and Zack and the other a memorial of flowers *329 and gifts deposited at the scene of the murders — introduced an arbitrary factor into the sentencing proceeding, in violation of the defendant’s rights under the federal and state constitutions.
During the penalty phase of trial, the state called Deputy Plaisance as its first witness. The deputy, a rookie officer seven weeks into the job, outlined for the jury |fiShis response to the call of. a shooting in the Tall Timbers neighborhood, his efforts to resuscitate Zack, his observation of Adrienne’s lifeless body, the roping off of the crime scene, and the sheriff department’s policy of offering debriefings and professional counseling sessions to officers after violent crimes. Deputy Plaisance recounted the emotional anguish and stress he experienced during the harrowing experience, in which he observed the gaping wounds suffered by Adrienne and Zack and the blood gushing from the young boy’s body with every chest compression administered in a desperate effort to save his life, all against the backdrop of terrified screams from S.M. and L.M.
Talazac, a subdivision resident and a registered nurse, also testified during the penalty phase. Recalling the afternoon of April 18, 2007, in which she was feeding her dogs and preparing her son for baseball practice before leaving to teach a catechism class at the local church, Talazac recounted how, after being summoned to provide assistance, she first approached Adrienne’s lifeless body on the pavement and realized that no efforts could resuscitate her. She explained her actions, along with those of Deputy Plaisance and other residents, in trying to revive and provide emergency medical care to Zack. She testified that despite realizing there was no blood circulating in the boy’s body, she and the others continued their lifesaving efforts until an ambulance arrived on the scene. She confirmed she had received counseling as a result of the incident.
Talazac also testified that she assisted in distributing and posting fliers for a candlelight vigil held at the scene of the crime on what would have been Zack’s sixth birthday. She identified two photographs taken at the scene — one depicting the flier announcing the vigil and the other portraying the profusion of flowers and gifts deposited at the crime scene in a makeshift memorial for the victims.
| sfiThe defendant protests the introduction of this evidence into the penalty phase of the trial. Citing Bernard, supra, the defendant argues that “[v]ictim impact evidence, by its very nature, is emotionally charged material which involves the risk of injecting arbitrary factors into a capital sentencing hearing.” Bernard, 608 So.2d at 968. For that reason, Louisiana’s capital sentencing scheme carefully limits the scope of permissible victim impact testimony to that which is relevant to circumstances of the murder or to the character and propensities of the defendant. See La.C.Cr.P. art. 905.2(A); Bernard, 608 So.2d at 970. The defendant argues that this court recognized the circumscribed nature of victim impact testimony in Bernard:
To the extent that such [victim impact] evidence reasonably shows that the murderer knew or should have known that the victim, like himself, was a unique person and that the victim had or probably had survivors, and the murderer nevertheless proceeded to commit the crime, the evidence bears on the murderer’s character traits and moral culpability, and is relevant to his character and propensities as well as to the circumstances of the crime. However, introduction of detailed descriptions of the good qualities of the victim or particularized narrations of the emotional, psy *330 chological and economic sufferings of the victim’s survivors, which go beyond the purpose of showing the victim’s individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of the murder, treads dangerously on the possibility of reversal because of the influence of arbitrary factors on the jury’s sentencing decision.
Bernard, 608 So.2d at 972.
Drawing upon Bernard’s cautionary language, the defendant argues that community members, such as Deputy Plai-sance and Talazac, who have no personal knowledge of the victims, cannot give a face to the victims and, thus, their testimony injects a constitutionally unacceptable arbitrary factor into the jury’s sentencing decision, requiring reversal.
lfi7As an initial matter, the defendant did not object to the testimony of either Deputy Plaisance or Talazac and so arguably waived any claim of error. See La.C.Cr.P. art. 841; State v. Wessinger, 98-1234, p. 20 (La.5/28/99), 736 So.2d 162, 180-81 (re-instituting the contemporaneous objection rule for the penalty phase, as well as the guilt phase of a capital trial). Notwithstanding, both individuals, while not relatives or personal friends of the victims, were directly involved in the efforts to save the victims’ lives. They were certainly competent to testify to the “circumstances of the offense.” La.C.Cr.P. art. 905.2(A) (“The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact the crime has had on the victim, family members, friends, and associates.”) (emphasis added). Because their testimony falls within the scope of La.C.Cr.P. art. 905.2(A) and its characterization of permissible victim impact testimony, the defendant fails to demonstrate error in the admission of the testimonies of these individuals.
A contemporaneous objection was lodged to the photograph of the makeshift memorial to Adrienne and Zack created by subdivision residents and to the photograph of the flier announcing a candlelight vigil in the neighborhood. The defendant insists that these photographs shed no light on the “impact the crime has had on the victim, family members, friends, and associates” and, thus, exceeded the scope of permissible victim-impact evidence. However, the defendant acknowledges that several courts have condoned the admission of similar evidence involving memorials or vigils held for homicide victims. See United States v. Bolden, 545 F.3d 609 (8th Cir.2008) (a collection of photographs taken at memorial service were relevant to the victim’s uniqueness as a human being and the impact of his death and, thus, their admission was not unduly prejudicial); People v. Brady, 50 Cal.4th 547, 113 Cal.Rptr.3d 458, 236 P.3d 312 (2010) (videotape of memorial and funeral services was admissible to show impact of murder on loved ones and the community). Nevertheless, the defendant argues that these cases involved the victim’s professional communities and, thus, revealed the impact of the victims’ deaths on their friends and associates. By contrast, the defendant argues, in the present case, the vigil was probative only of the impact the crime had on scores of faceless community members, who likely had never met the victims.
The defendant’s argument in this regard is unpersuasive. The photographs reflect the neighborhood’s efforts to honor the victims. They do not demonstrate an attempt to introduce evidence of the crime’s influence on the entire parish. The murders occurred in the Tall Timbers subdivision, where the Magee family resided with Tracy. Residents of the neighborhood feverishly worked to save Zack’s life and to provide assistance to S.M. and L.M. The *331 defendant’s protestations to the contrary notwithstanding, testimony from members of the Tall Timbers neighborhood and photographs of their efforts to memorialize the victims served to give a face to the victims, to underscore their uniqueness as individuals, and to acknowledge the loss experienced by the surviving members of the family. As a result, the evidence fell within the permissible scope of La.C.Cr.P. art. 905.2(A).
Moreover, assuming for the sake of argument that the admission of the photographs was erroneous, the defendant fails to demonstrate they unduly biased the jury against him and rendered trial of the penalty phase fundamentally unfair. Given the other mitigating and aggravating evidence presented during the penalty phase, the admission of the two photographs, if erroneous, was clearly harmless.
The defendant’s assignment of error number 4 lacks merit.
J^SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La. S.Ct.R. 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, consideration is given to the following: (1) whether the jury imposed the sentence under influence of passion, prejudice, or other arbitrary factors; (2) whether the evidence supports the jury’s findings with respect to a statutory aggravating circumstance; and (3) whether the sentence is disproportionate, considering both the offense and the offender. La. S.Ct.R. 28, Rule 905.9.1, sec. 1.
In the instant case, the district court has submitted a Uniform Capital Sentence Report (“UCSR”) and the Department of Public Safety and Corrections has submitted a Capital Sentence Investigation Report (“CSI”). These documents reveal that the defendant is a white male who was 29 years old at the time the murders were committed. The oldest of two children born to Bonnie Singletary Magee Cooper and Burnis James Magee, the defendant was nine years old when his parents divorced. Thereafter, Burnis and Bonnie had shared custody of the children. From all indications, the defendant had a normal childhood. He dropped out of high school in the tenth grade, but later earned his General Equivalency Development certificate through the Louisiana Youth Challenge Program.
The defendant married Adrienne in 1988 and had three children. In addition, the defendant has two sons from a previous relationship, who reside with their mother.
The defendant obtained training as a welder, pipe fitter, and metal fabricator. At the time of the crimes, he was employed by Textron Marine. Apart from the instant offenses and a pending assault charge stemming from an incident involving 170a correctional officer, he has no prior criminal history. The defendant reported that, at the time of the offense, he was under the influence of multiple prescription drugs and alcohol and does not have a clear memory of the events, although he feels “horrible” about his actions.
A. Passion, Prejudice or Other Arbitrary Factors
The record reveals no indicia of passion, prejudice, or arbitrariness. Although the defendant avers that race played a factor in the state’s charging decision — arguing that 78% of first-degree murder prosecutions in St. Tammany Parish involved white victims, that every death sentence imposed in this judicial district was for the death of a white victim, and that on only one occasion has the state sought the death penalty in a case involving an Afri *332 can-American victim — he ultimately fails to demonstrate how this unsubstantiated claim of racism in the state’s charging decision affected the jury’s imposition of the death penalty against him. Nothing in the record suggests race was an issue at trial. As discussed previously in this opinion, the defendant’s argument that the jury was prevented from hearing his daughters’ testimony and possible pleas to spare his life is without merit. Similarly, his claims that extensive pretrial publicity and comments by public officials skewed community sentiment against him and prevented him from receiving a fair trial in St. Tammany Parish have been considered and found lacking. Likewise, his claims that the jury was improperly influenced by the introduction of gruesome photographs, graphic testimony from community members and first responders, and Adrienne’s letter have been examined at length and determined to lack merit.
B. Aggravating Circumstances
During the penalty phase of trial, the state argued the existence of the following aggravating circumstances: (1) the offender was engaged in the perpetration or 17i attempted perpetration of cruelty to juveniles and second degree cruelty to juveniles; (2) the offender knowingly created a risk of death or great bodily harm to more than one person; (3) the victim was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant; and (4) the victim was under the age of 12 years.
In rendering its verdict, the jury found the existence of one aggravating circumstance with respect to Adrienne’s murder: the offender knowingly created a risk of death or great bodily harm to more than one person. With respect to Zack’s murder, the jury found two aggravating circumstances: the offender knowingly created a risk of death or great bodily harm to more than one person and the victim was under the age of 12 years.
The evidence presented to the jury, which included the defendant’s taped confession, established beyond a reasonable doubt that the defendant knowingly created a risk of death or great bodily harm to more than one person when, after ramming their vehicle with his truck and forcing it off the road, he leveled and fired a shotgun at his wife, son, and two daughters. The evidence also established beyond a reasonable doubt that one of the victims, five-year-old Zack, was under the age of 12 when he died. Thus, the record fully supports the jury’s findings as to the existence of the aforementioned aggravating circumstances.
C. Proportionality
The federal constitution does not require a proportionality review. See Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, eom-parative | ^proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 712 (La.1990).[44]
This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed *333 in other cases, considering both the offense and the offender. State v. Sonnier, 380 So.2d 1, 5 (La.1979). If the jury’s recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Id. at 7.
The state’s Capital Sentence Review memorandum reveals that since 1976, there have been 36 successful prosecutions (excluding the instant case) for first degree murder in the Twenty-second Judicial District Court, which comprises St. Tammany and Washington Parishes. In these cases, jurors have returned the death penalty ten times. However, three of the cases resulted in annulment of the death penalty and imposition of a life sentence.[45] In none of the ten capital cases did the jury find as an aggravating circumstance that the victim was under the age of 12 years or that the defendant knowingly created a risk of death or great bodily harm to more than one person.
Given the scarcity of comparable cases in St. Tammany and Washington Parishes, it is appropriate for this court to look beyond the judicial district in which the sentence was imposed and to conduct the proportionality review on a statewide |7iibasis. See State v. Davis, 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-31. A state-wide review of capital cases reflects that jurors often return the death penalty when a child under the age of 12 years is murdered and when multiple members of the same family are slain together. This court has affirmed capital sentences in the following cases: State v. Wright, 01-0322 (La.12/4/02), 834 So.2d 974 (defendant killed his girlfriend’s 6-year-old daughter with multiple blunt force trauma); State v. Carmouche, 01-0405 (La.5/14/02), 872 So.2d 1020 (defendant killed his two daughters, ages 15 and 2, and their mother, with shotgun), reh’g granted, 02-1407 (La.9/25/03), 872 So.2d 1049 (case remanded to consider issue of mental retardation in light of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 2244, 153 L.Ed.2d 335 (2002)); State v. LaCaze, 99-0584 (La.7/25/02), 824 So.2d 1063 (brother and sister gunned down, along with off-duty police officer working security detail, at family-owned restaurant); State v. Bridgewater, 00-1529 (La.1/15/02), 823 So.2d 877, reh’g granted, (La.6/15/02), 823 So.2d 909 (evidence sufficient to support first degree murder conviction and death sentence for slaying of man and his elderly mother during robbery/burglary of their home); State v. Deal, 00-0434 (La.11/28/01), 802 So.2d 1254 (2-month-old victim died from skull fracture and paper towels forced down throat); State v. Smith, 98-1417 (La.6/29/01), 793 So.2d 1199 (armed intruders killed 3-year-old boy, his mother and her boyfriend, with - multiple gunshots); State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224 (11-month-old infant killed by single gunshot wound to the head); Frank, 99-0553 (La.1/17/01), 803 So.2d 1 (brother and sister gunned down, along with off-duty police officer working security detail, at family-owned restaurant); Connolly, 96-1680 (La.7/1/97), 700 So.2d 810 (defendant, a Sunday school teacher, slashed throat of 9-year-old victim behind church after services); Sepulvado, 93-2692 *334 (La.4/8/96), 672 So.2d 158 (after three days of abuse, defendant beat 6-year-old stepson over the head with handle of screwdriver and immersed him in scalding water, resulting in burns over 60% of victim’s body); State v. Deboue, 552 So.2d 355 (La.1989) (defendant slashed throats of 6 and 11-year-old victims during the course of an aggravated burglary); State v. Copeland, 530 So.2d 526 (La.1988) (defendant and co-defendant repeatedly raped 11-year-old boy and shot him several times); State v. Brogdon, 457 So.2d 616 (La.1984) (defendant and accomplice repeatedly raped and tortured 11-year-old victim); State v. Lowenfield, 495 So.2d 1245 (La.1985) (defendant killed his mother, his mother’s husband, his girlfriend, her 4-year-old chil, and the child’s father).
A comparison of the defendant’s case— in which he lay in wait for and then followed his wife and their three young children from her place of work; rammed her car with his truck, forcing it off the road; exited his truck and, at close range, fired a shotgun repeatedly, striking and killing his wife and five-year-old son and injuring his eight and nine-year-old daughters — with previous cases indicates the death penalty as applied to James is not disproportionate considering the offender and the offense.[46]
DECREE
For the reasons assigned herein, the defendant’s conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for cer-tiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court |7Btimely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the district court shall, upon receiving notice from this court under La.C.Cr.P. art. 923 of finality on direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1 and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
JOHNSON, Justice, concurs in result.
CLARK, Justice, additionally concurs and assigns reasons.

. Consistent with the provisions of La. R.S. 46:1844(W)(l)(a), the full names of the surviving minor victims are omitted so as to protect the identity of the children.

. The defendant’s reply brief and supplemental brief on appeal raises two additional assignments of error which are also considered herein.

. Latapie advised James to "get out the barroom," and he apparently did so, calling La-tapie the next morning to thank him for talking him out of it.

. The state also introduced testimony from Anna Pierce, a store employee who identified the defendant as the individual who purchased 100 rounds of shotgun shells from her on the afternoon of April 18, 2007.

. The assignments of error not discussed in the body of this opinion do not constitute reversible error and are governed by well-settled principles of law. Those assignments are addressed in an unpublished appendix comprising a part of the official record in this case.

. The quoted excerpt recited: “I feel my life could be in danger due to his mental state due to our separation and the loss of the kids. He is [p]assing by my work looking for me and looking for me while he has the kids.” Rioux and Hamilton, Woman’s plea for help was too late, The Times Picayune, April 20, 2007, at A-1.

. When reporters asked the defendant if he had a message for his daughters, he responded, "I love you. I'm sorry. That’s it. That’s all.” The defendant complains that authorities permitted the press to bombard him with questions and then turn his interviews over to the state so it could introduce the statements against him at trial.

. For example, the defendant cites to a news article appearing on the front page of the newspaper on October 10, 2009, two days before voir dire examinations commenced and to the district court’s own admission that it had viewed television coverage of the case on the morning of October 12, 2009. Benjamin Alexander-Bloch, Jiuy pick starts in father’s murder case; Wife, son killed in '07; Girls survived attack, The Times Picayune, October 10, 2009, at A-l.

. D.A. seeks death penalty in 'heinous' crime, WWLTV broadcast, May 24, 2007.

. Interestingly, the Hoffman trial was ranked as the sixth biggest news story in St. Tammany Parish in 1998. Hoffman, 98-3118 at 6 n. 2, 768 So.2d at 553 n. 2. The present case was similarly ranked as the sixth biggest new story in St. Tammany Parish in 2007. Folsom aldermen recall top story in 2007; ACLU v. Slidell City Court, death of two deputies also high on the list, The St. Tammany News, December 31, 2007.

. These census figures predate the crimes by seven years. The 2010 Census, taken one year after trial, reflects an even larger population of 233,740. See http://quickfacts.census. gov/qfd/states/22/22103html.

.For example, the defendant points to a photograph of Tall Timbers resident Bryars that appeared in the newspaper two days following the crimes. The photograph shows Bryars with hydrochloric acid, attempting to clean blood stains from the street. Rioux and Hamilton, Woman’s plea for help was too late, The Times Picayune, April 20, 2007, at A-l (Staff photo by Chuck Cook). The next day’s edition describes Bryars as “haunted by the image of the boy lying mortally wounded on the street and the words of his 7-year-old *304 sister,” and quotes Bryars as saying, “I'll never get that out of my mind.” Rioux and Hamilton, Suspect booked with murders, The Times Picayune, April 21, 2007, at A-9.

.The defendant points out that in the wake of the crimes, a state senator called for a hearing on domestic violence. See Milena Merrill, La. Senator Calls for Domestic Violence Hearing, NOLA.com, April 24, 2007, http://blog.nola.com/northshoreview/2007/04/ la_senator_calls_for_domestic.html.

. See Rioux and Hamilton, Suspect booked with murders, The Times Picayune, April 21, 2007; Bruce Hamilton, Murder suspect denied bond, The Times Picayune, April 25, 2007.

. While a "fun fair” in memory of Adrienne and Zack was held on the one-year anniversary of their deaths, this fund raiser for the Children’s Advocacy Center at Hope House occurred more than a year in advance of the trial.

. The defendant also cites answers from Mark Audibert and Ward Theriot as further illustrations of allegedly insufficient questioning by the district court with regard to these jurors’ exposure to media coverage of the case. However, as with Besson, both jurors informed the court that they could, in spite of some knowledge of and exposure to the case. serve fairly and impartially, and counsel was given the opportunity to question each juror individually to explore any potential bias.

. Any limitations in the jury questionnaires themselves were cured by the subsequent questioning of each prospective juror on an individual basis.

. Moreover, the prospective jurors were questioned on an individual basis, in a sequestered setting, so there was no risk of having one prospective juror's answers influenced or tainted by those of another.

. The defendant challenged juror Theriot for cause during the preliminary round of voir dire questioning, alleging his responses indicated he leaned heavily in favor of the death penalty and would be unable to give effect to the relevant mitigating circumstances, but the district court denied the cause challenge. During the second round, the defendant had five peremptory strikes remaining, but opted not to exercise one against juror Theriot, reporting to the district court, "[hje's all right.” Likewise, after the initial round of examination, the defendant challenged juror Audibert for cause, alleging he would be unable to consider a life sentence as an appropriate punishment. The district court denied the cause challenge. At the conclusion of voir dire, the defendant again chose not to use one of his five remaining peremptory strikes against juror Audibert. As to prospective jurors Thornton and Stanton, the defendant alleged Thornton was unable to consider mitigating evidence, but his cause challenge, lodged during the initial round of questioning, was denied by the district court. A jury was seated before Thornton was questioned for a second time. Similarly, during the first round of questioning, the defendant challenged Stanton for cause, alleging she would be unable to consider a life sentence and would vote presumptively to impose the death penalty. The district court denied the cause challenge, but a jury was seated before Stanton was questioned for a second time.

. The defendant argues that this court has not been consistent in its application of the "strike or waive” rule, citing State v. Sylvester, 400 So.2d 640 (La.1981), as an example. In Sylvester, the court reversed a first degree murder conviction after finding the district court had erroneously denied a cause challenge of a juror who could not follow the law on self-defense. The defendant challenged the juror for cause and objected when the challenge was denied, but then accepted her on the jury. The court found that because the defendant had fulfilled the requirements of La.C.Cr.P. art. 800 (which required at the time that the defendant have exhausted his peremptory challenge before the completion of the panel), the issue was "properly before us.” Sylvester, 400 So.2d at 644. While Sylvester was decided after Fallon, it predates Bourque and the litany of cases that have followed, all applying the rule. Moreover, the focus of the court in Sylvester was on the requirements of La.C.Cr.P. art. 800 and not on the principles of waiver which underpin the "strike or waive” rule.
As another example of inconsistent application, the defendant points to Juniors, 915 So.2d 291, (Weimer, J., on re'g), in which the author voted to grant rehearing to omit a reference in the opinion to the "strike or waive” rule, finding it unnecessary to the resolution of the case. However, in Juniors, the validity of the "strike or waive” rule was not squarely raised. This case, unlike Juniors, State v. Weary, 03-3067 (La.4/24/06), 931 So.2d 297 (Weimer, J., concurring), and State v. Scott, 04-1312 (La.1/19/06), 921 So.2d 904 (Weimer, J., concurring), squarely challenges the validity of the rule.

. La.C.Cr.P. art. 800 provides:

. La.C.Cr.P. art. 800 was amended by 1983 La. Acts 181, § 1. Previously, the article read: "A defendant cannot complain of a ruling refusing to sustain a challenge for cause made by him, unless his peremptory challenges shall have been exhausted before the completion of the panel.”

. See, e.g., People v. Macrander, 828 P.2d 234 (Colo.1992); State v. Esposito, 223 Conn. 299, 613 A.2d 242 (1992); People v. Crittenden, 9 Cal.4th 83, 36 Cal.Rptr.2d 474, 885 P.2d 887 (1995); State v. Good, 309 Mont. 113, 43 P.3d 948 (2002); Busby v. State, 894 So.2d 88 (Fla.2005) (collecting cases).

. Permitting a defendant to seek a new trial when there is a remedial tool available to cure the defect could lead to unwarranted costs and inefficiencies for the parties, the court, and citizens called in to serve as jurors.

. This case is factually distinguishable from State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845. Here, the record is devoid of any evidence suggesting defendant did not acquiesce to the seating of jurors Theriot and Audibert following the denials of his challenges for cause.

.La.C.Cr.P. art. 797 provides, in pertinent part, that the state or the defendant may challenge a juror for cause on the ground that:
(2) The juror is not impartial, whatever the cause of his partiality....
[[Image here]]
(4) The juror will not accept the law as given to him by the court.

. The questioning was based on responses to a questionnaire the prospective jurors had completed prior to trial.

. Those prospective jurors who were not dismissed for cause following this initial round of examination were then subjected to general voir dire. Those surviving challenges for case after general voir dire were subjected to peremptory challenges until a jury, with four alternate members, was selected.

. Goostrey returned for a second round of questioning and, along with a panel of fellow prospective jurors, answered inquiries regarding his perception of police, ability to work in groups, and comfort level with imposing the death penalty. At the conclusion of questioning, defense counsel peremptorily challenged Goostrey.

. The district court explained: "Counsel, my one suggestion may be, because intoxication, without the statutory language, or at least some permutation of it, ... tends not to provoke a true response. Perhaps you may want to tailor your questions.”

. La. C.E. art. 901(B) provides, in pertinent part:
By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Article:
(1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.

. The situation in this case is factually distinguishable from those in Guillard, supra, and State v. Hotoph, 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, writ denied, 99-3477, 00-0150 (La.6/30/00), 765 So.2d 1062, 1066, cited by the defendant, in which letters were ruled inadmissible because the state did not establish the origin of the letters or who wrote them. Here, Tracy established, based on personal knowledge and observation, that Adrienne authored the letter at issue.

. Unless, of course, "it relates to the execution, revocation, identification, or terms of declarant’s testament.” La. C.E. art. 803(3)

. For evidence to be admissible under the state of mind exception, the declarant’s state of mind must be at issue or relevant to prove a fact at issue. See State v. Doze, 384 So.2d 351, 353 (La.1980). However, as we explained in Martin, 458 So.2d at 461:
Where the victim-declarant’s state of mind is offered to prove the victim’s subsequent acts, the problems of relevancy are not nearly so great as where the defendant’s or another person’s acts are sought to be proved. .Although a state of mind evidenced by a speaker's remarks cannot be used to prove the speaker's past conduct, it can be used to prove the speaker’s subsequent conduct. [Citations omitted.]

. For example, the state presented Pierce's testimony that the defendant "acted like a normal customer" and did not show any signs of agitation or intoxication when he calmly purchased 100 rounds of shotgun shells from her on the afternoon of the murders.

. In Raymond, as the victim observed the approach of the defendant, he stated he was hiding behind a tree because the defendant would want him to have sexual relations. One issue in the case was whether the defendant was with the victim at the time of the homicide, which occurred several hours later. The court held the victim's state of mind or emotional attitude toward the defendant was admissible insofar as it tended to increase or decrease the likelihood of a later contact with the defendant.

. Contrary to the defendant’s contentions, the Confrontation Clause of the Sixth Amendment does not pose an independent bar to the admission of these statements as they were clearly not "testimonial” in nature, i.e., they were not made to assist the investigation or prosecution of a crime that had not yet occurred. See Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
Likewise, there is no merit to the defendant’s contention that the statements should have been excluded for failing to satisfy the balancing test of La. C.E. art. 403. Although the district court did not specifically rule on the admissibility of the statements under La. C.E. art. 403 (perhaps because it was not asked to), the court admitted the statements, implicitly finding that their probative value substantially outweighed the danger of "unfair prejudice, confusion of the issues, or misleading the jury.” La. C.E. art. 403. We find no abuse of discretion in this determination. At any rate, given the wealth of evidence of the defendant’s culpability introduced into the record, any error in admitting the statements was clearly harmless.

. The photographs in Monis depicted a body during autopsy in which the lengthy incision was shown, "the laying bare of the inner portions of the body, and the suction apparatus evacuating some of the bloody contents of the body cavity." Morris, 157 So.2d at 730. Many of the photographs depicted "the hands of the coroner and his assistant ... holding various organs within the bloody opening.” Id. at 730-31.

. La.C.Cr.P. art. 905.5 enumerates the factors that shall be considered mitigating circumstances at the capital sentencing hearing. La.C.Cr.P. art. 905.5(h) lists as one of those factors "[a]ny other relevant mitigating circumstances.”

. The state cited United States v. Taylor, 583 F.Supp.2d 923 (E.D.Tenn.2008), Ross v. State, 954 So.2d 968 (Miss.2007), Greene v. State, 343 Ark. 526, 37 S.W.3d 579 (2001), Kelly v. Lynaugh, 862 F.2d 1126 (5th Cir.1988), and Robison v. Maynard, 829 F.2d 1501 (10 th Cir.1987), for the proposition that mitigating evidence is limited to evidence concerning the defendant's background or character or the circumstances of the offense.

. One likely explanation for this omission appears to be that defense counsel had never spoken with the girls. In her testimony, Tracy admitted she had not responded to a letter from defense counsel asking permission to meet with the girls because she did not want counsel to speak to the girls.

. Interestingly, the defendant cites to only one part of the authors’ comments on this point, omitting the qualifying sentence which follows: "On the other hand, it must be recognized that the legislative history of the Louisiana rule indicates a rejection of the more liberal federal rule." Handbook Of Louisiana Evidence Law at 344.

. The author of this opinion continues to subscribe to the concurring opinion of Justice Traylor in Manning that the direct solicitation of a witness’s sentencing preference is improper. See Manning, 03-1982 at 2-3, 885 So.2d at 1115-16 (Traylor, J., concurring). However, because the district court ruling clearly did not cause prejudice to the defendant, it is not necessary at this time to revisit the majority’s position in Manning.

. This court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors.” State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also, State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (in dictum, this court suggested the death penalty was disproportionate).

. See State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651 (first degree murder conviction and death sentence set aside with instructions for district court to enter judgment of second degree murder and sentence of life imprisonment); State v. Willie, 360 So.2d 813 (La.1978) (first degree murder conviction affirmed, death sentence vacated and remanded for imposition of life sentence); State v. Clark, 340 So.2d 208 (La.1976) (first degree murder convictions affirmed, death sentences annulled and remanded for imposition of life sentences).

. The post-trial pleadings filed pursuant to La. S.Ct.R. 28 have been thoroughly reviewed by this court and nothing warranting reversal of the defendant’s death sentence has been found. Satisfied that the pleadings comport with the requirements of this court's rules and provide a sufficient basis for conducting a meaningful proportionality review, the defendant's motion for completion of the state's sentence review memorandum in accordance with Rule 28 is denied.